Slip Opinion 01-154

# UNITED STATES COURT OF INTERNATIONAL TRADE

——————————————————————————

|  |  |  |
|---|---|---|
| NIPPON STEEL CORPORATION, | : | |
| NKK CORPORATION, | : | |
| KAWASAKI STEEL CORPORATION | : | |
| and | : | |
| TOYO KOHAN CO., LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Court No. 00-09-00479 |
| | : | |
| UNITED STATES, | : | **Public Version** |
| | : | |
| Defendant, | : | |
| | : | |
| WEIRTON STEEL CORPORATION, | : | |
| | : | |
| Defendant-Intervenor. | : | |

——————————————————————————

[ITC injury determination remanded.]

Dated: December 31, 2001

Willkie Farr & Gallagher (William H. Barringer; James P. Durling; Daniel L. Porter; Sean M. Thornton; Karl von Shriltz) for plaintiffs.

Lyn M. Schlitt, Office of General Counsel, James M. Lyons, Deputy General Counsel, U.S. International Trade Commission (Laurent deWinter), for defendant.

Schagrin Associates (Roger B. Schagrin), for defendant-intervenor.

# OPINION

**RESTANI, Judge:**

Nippon Steel Corporation, NKK Corporation, Kawasaki Steel Corporation, and Toyo

Kohan Co., Ltd., (collectively "Nippon" or "Plaintiffs"), respondents in the underlying

investigation, move for judgment upon the agency record pursuant to USCIT Rule 56.2.  At issue

is the final determination of the International Trade Commission (the "Commission") in Tin- and Chromium-Coated Steel Sheet From Japan, 65 Fed. Reg. 50005, USITC Pub. 3300, Inv. No. 731-TA-860 (final determ.) (Aug. 2000) (hereinafter "Final Determination"). Nippon first contests the Commission's final affirmative material injury determination in the Tin- and Chromium-Coated Steel Sheet (TCCSS) investigation on the grounds that political interference with the Commission's deliberations violated Plaintiff's right to procedural due process. Second, Nippon challenges the Commission's use of aggregated data in making its injury determination, and contends that its findings with respect to the effects of subject import volume and prices are not supported by substantial evidence. Third, Nippon argues that the Commission did not adequately assess alternative causes of material injury.

### JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581 (c) (1994). The court will uphold the Commission's determination in antidumping investigations unless it is "unsupported by substantial evidence in the administrative record or is otherwise not in accordance with law." 19 U.S.C. § 1516(a)(2)(B)(i).

### FACTUAL AND PROCEDURAL BACKGROUND

The Commission initiated an antidumping investigation of TCCSS imports[1] pursuant to a

---

[1] The Department of Commerce ("Commerce") defined the imported merchandise within the scope of the investigation generally as "tin mill flat rolled products that are coated or plated with tin, chromium or chromium oxides." Tin- and Chromium-Coated Steel from Japan, 65 Fed. Reg. 39,364, 39,365 (Dep't Comm. 2000) (final determ.).

petition filed in November 1999 by Weirton Steel Corporation ("Weirton") and two labor unions.

None of the other six U.S. producers of TCCSS joined the petition, but all participated in the

investigation.[2]  See Final Staff Report at III-1,  C.R. Doc. 145, App. Tab 1.  The Commission

held a hearing on November 18, 1999, at which it heard testimony from the parties and industry

representatives.  Prelim. Hr'g Tr. at 72-83, 87-98, P.R. Doc. 18, App. Tab 3.

In December 1999, the Commission issued an affirmative preliminary determination of

material injury.  See Tin- and Chromium-Coated Steel Sheet From Japan, 64 Fed. Reg. 71497,

USITC Pub. 3264, Inv. No. 731-TA-860 (Dec. 1999) at 13-14 (Preliminary Determination).  On

June 29, 2000, the Commission held a public hearing at which four of the largest TCCSS

purchasers in the U.S. market testified, as did seven Members of Congress, including U.S.

Senator John D. Rockefeller IV.  Tin- and Chromium-Coated Steel Sheet from Japan:  Hearings

before the United States International Trade Commission 44-54 (June 29, 2000) (hereinafter

"Hr'g Tr.").    In June 2000, the Department of Commerce issued final antidumping duty

margins as follows:  95.29 percent for Kawasaki, 95.29 percent for Nippon, 95.29 percent for

Toyo Kohan and 32.52 percent for all others.  See 65 Fed. Reg. 39,364 (Dep't Comm. June 26,

2000).

In August 2000, the Commission, in a 4-2 vote, determined that Japanese imports of

TCCSS were being sold at less than fair value ("LTFV") and, as a result, were both materially

injuring and threatening further material injury to an industry in the United States.  See Final

Determination at 1.  In evaluating the relevant factors, the Commission first concluded that

_____

[2] Non-petitioners include the following producers:  Bethlehem Steel Corp., LTV Steel
Co., National Steel Corp., USS Posco Industries Inc., Ohio Coatings Co., and U.S. Steel Group.

Japanese import prices "depressed and suppressed domestic [producers'] prices to a significant degree." Id. at 27. This conclusion rested principally on several factual findings regarding, inter alia, (1) the existence of "underselling" by Japanese suppliers; (2) the industry practice of establishing prices via negotiations for annual requirements contracts; (3) the relative importance of non-price factors; and (4) allegations of lost sales and lost revenue because of subject imports. Second, the Commission concluded that the volume of subject imports grew rapidly over the period of investigations. Id. at 12. Finally, the Commission concluded that the domestic industry's financial performance was poor throughout the period of investigation, with the worst results coinciding with the largest increase in imports during the first three quarters of 1999. Id. at 25.

Nippon appeals the Commission's final determination of material injury, claiming that Senator Rockefeller's testimony appeared to and did impermissibly influence the Commission's final determination. Nippon also contests the Commission's findings with respect to volume, price effects, and overall causation of injury.

## DISCUSSION

### I. Congressional Interference

During the final phase of the investigation, Senator Rockefeller testified before the ITC Commissioners at a public hearing on June 29, 2000. After expressing his view on the state of the domestic industry, Senator Rockefeller related his perceptions regarding the legislative intent

behind the addition of the requirement that the Commission analyze "conditions of competition"

under 19 U.S.C. § 1677 (7)(C).  Senator Rockefeller stated:

> From what I understand, what is occurring here at the Commission is that lawyers and
> economists representing foreign competition or U.S. buyers, who can't argue about the
> numbers that your staff has gathered, are spending their time before the Commission
> arguing about conditions of competition and taking the focus away from the statute,
> which is called the law insofar as I'm aware. I find this deeply disturbing, and I hope,
> perhaps vainly, that the Commission will seriously reconsider the matter. There should be
> no need for Congressional action.

Hr'g Tr. at 50-51 , P.R. Doc. 74, App. Tab 4.  Nippon claims that Senator Rockefeller's reference

to "Congressional action" constituted an impermissible "threat" to reduce Congressional

appropriations to a subdivision of the ITC.  Nippon argues that its due process rights were

violated because this alleged threat not only had the fatal appearance of partiality but also

actually interfered with the ITC's decision-making process.[3]

---

[3] Defendant argues that Nippon failed to exhaust its remedies before the Commission by
not objecting to Senator Rockefeller's testimony during the administrative proceedings.  Section
2637(d) of Title 28 of the United States code directs that "the Court of International Trade shall,
where appropriate, require the exhaustion of administrative remedies."  "By its use of the phrase
'where appropriate,' Congress vested discretion with the court to determine the circumstances
under which it shall require the exhaustion of administrative remedies."  FAG Kugelfischer
Georg Schafer AG v. United States, 131 F. Supp. 2d 104, 113 (2001); see also Cemex, S.A. v.
United States, 133 F.3d 897, 905 (Ct. Int'l Trade 1998).  "[T]he Court has exercised its discretion
to obviate exhaustion where requiring it would be futile, see Rhone Poulenc, S.A. v. United
States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984), or the question is one of law and does not
require further factual development and, therefore, the court does not invade the province of the
agency."  Id.; see also R.R. Yardmasters of America v. Harris, 721 F.2d 1332, 1337-39 (D.C.
Circ. 1983).  Whether a Member of Congress impermissibly interfered with an antidumping
investigation based on participation in a hearing is a question of law, requiring no further factual
findings beyond what is already on the record, including the hearing transcript.  Further, the
usefulness of an objection to the testimony after the fact is doubtful.  Therefore, we reach
Nippon's arguments.

Antidumping proceedings are not adjudicatory but investigatory.[4]  See NEC Corp. v.

United States, 21 CIT 933, 948-49 (1997) (citing H.R. Rep. No. 96-317, at 77 (1979); S. Rep.

No. 96-249, at 100 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 486, and Budd Co. v. United

States, 1 CIT 67, 72, 507 F. Supp. 997, 1001 (1980)), aff'd, 151 F.3d 1361 (1998).  The test for

improper interference in an administrative proceeding that is neither judicial nor quasi-judicial is

"whether the Congressional action actually affected the decision."  Peter Kiewit Sons' Co. v.

U.S. Army Corps. of Engineers, 714 F.2d 163, 169 (D.C. Cir. 1983) (citing D.C. Federation of

Civic Associations v. Volpe, 459 F.2d 1231, 1246-47 (D.C. Cir. 1971), cert. denied, 405 U.S.

1030 (1972)).  Thus, Nippon's assertion that Senator Rockefeller's statement gives the

"appearance of impropriety" misstates the applicable standard.

Even if a more stringent standard applies, Nippon's claim fails.  First, there is no

prohibition against Members of Congress testifying at public hearings before the Commission.[5]

Second, the Senator's statement that "there should be no need for Congressional action" does not

appear to be a "threat" to reduce appropriations to the Commission or any subdivision thereof.

Senator Rockefeller is not on the appropriations committee and there is no evidence that he was

behind the proposal to reduce appropriations for the Office of Economics at the International

---

[4] The court does not read Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1379-82 (Fed. Cir. 2001) (finding unfair trade proceedings *akin* to final adjudications for purposes of deference to statutory interpretation) to change this basic fact.  For example, basic core findings must be made without regard to the claims of the parties, *ex parte* factual submissions are permitted, there is no administrative law judge, and there is no formal record prior to the final determination.

[5] Presumably, Members of Congress know something about the state of industries within their districts or states.  It is less likely that individual Members of Congress can provide meaningful post-enactment legislative history, but they are not forbidden from opining thereon.

Trade Commission. Indeed, the context of Senator Rockefeller's comment strongly suggests that he was indicating his view that it should be unnecessary for Congress to have to revise the statute. His testimony centers on his perception that the Commission was misinterpreting the purpose of the statutory requirement that the Commission evaluate "conditions of competition."[6] Irrespective of whether Senator Rockefeller's interpretation of the statutory mandate to analyze "conditions of competition" is accurate, the Commission is presumed to apply the law properly. NEC Corp., at 1372 (quoting Parsons v. United States, 670 F.2d 164, 166 (Ct. Cl. 1982)) ("It is well established that there is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and the burden is on the Plaintiff to prove otherwise."). Third, there is nothing in the record to support a finding that Senator Rockefeller's testimony affected the Commission's decision-making at all. The Commission's determination is considered and replete with citation to and analysis of the factual findings in the Staff Report. Accordingly, Nippon fails to establish that Senator Rockefeller's testimony improperly affected the Commission's decision, or that it gives an appearance of partiality by the Commission.

---

[6] Senator Rockefeller had stated that the legislative intent in adding the requirement that the ITC evaluate "conditions of competition" was, in his words, "to make clear that even in situations where the unfair trading occurred during an upward phase of the demand cycle, material injury by law now could nevertheless be caused by unfair imports." Hr'g Tr. at 49. Accordingly, he concluded, "[i]n the context of business cycles and conditions of competition, the Commission should not flip, but has, our intent around and make negative decisions based on your analysis of conditions of competition." Id. at 50.

## II. Material Injury

To determine whether the subject imports have caused material injury to a domestic industry, the Commission is required to consider three factors: (1) the volume of the subject imports; (2) the effect of the subject imports on prices of domestic like products; and (3) the impact of the subject imports on domestic producers of like products. See 19 U.S.C. § 1677(7)(B). Nippon disputes the Commission's findings with respect to volume and price effects. Although Nippon does not directly challenge the Commission's findings regarding the impact on the domestic industry, Nippon does dispute the Commission's overall conclusion that material injury was "by reason of" subject imports. See 19 U.S.C. § 1673d(b).

## A. Volume

Under 19 U.S.C. § 1677(7)(c)(1), the Commission shall consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." "It is the significance of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." USX Corp. v. United States, 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987); see also Atlantic Sugar, Ltd. v. United States, 2 CIT 18, 23, 519 F. Supp. 916, 921-22 (1981). There is no minimum rate of increase in subject import volume or a baseline percentage of market share for subject imports, above which volume will be considered "significant." Congress has specified that "for one industry, an apparently small volume of imports may have a significant impact on the market; for another the same volume might not be significant." H.R. Rep. 317, 96th Cong., 1st Sess. 46 (1979); see also S. Rep. No. 96-249, 96th Cong., 1st Sess. at 88 ("The significance

of the various factors affecting an industry will depend upon the facts of each particular case.").

Thus, for the Commission's findings under section 1677(7)(C)(1) to be supported by substantial

evidence, the Commission must analyze the volume and market share data in the context of

conditions of competition. This is especially crucial where, as here, subject imports represent a

small percentage of market share relative to that held by the domestic industry.[7]

### 1. Domestic Market Share and Apparent Domestic Consumption

In determining the significance of subject import volume, the Commission must assess

the extent to which, if at all, subject imports "captured" market share from the domestic industry

over the POI. This inquiry typically entails accounting for an increase or decrease in domestic

producer's market share and in domestic consumption overall. See, e.g., Taiwan Semiconductor

Indus. Ass'n v. United States, 118 F. Supp. 2d 1250, 1258 (Ct. Int'l Trade 2000) (sustaining

Commission's negative material injury determination based on a finding that volume lacked

significance in relative terms where there was a "substantial increase in U.S. apparent

consumption" and there was a greater market share held by non-subject imports). For the volume

of subject imports to be considered significant, there is no requirement that subject imports

account for *all* of the decline in domestic industry's market share. It is sufficient that the

Commission point to evidence showing that subject imports captured a substantial portion of

market share from the domestic industry.

---

[7] Relative to consumption of TCCSS in the United States, the market share of subject imports in terms of quantity was [    ] percent in 1997; [    ] percent in 1998; [    ] percent in 1999; and [    ] percent in the first quarter of 2000. Final Determination at 12-13 (citing Staff Report at Table IV-4). The market share held by the domestic industry in terms of quantity was as follows: [    ] percent in 1997; [    ] percent in 1998; [    ] percent in 1999; and [    ] percent in the first quarter of 2000.

Here, the Commission found that, in absolute terms, tons imported from Japan increased by 85.9 percent between 1997 and 1999 and "continued to increase rapidly through the first quarter of 2000." Final Determination at 12.[8] The Commission calculated that "the quantity of subject imports increased by 35.6 percent between 1997 and 1998; by 37.0 percent between 1998 and 1999; and was 8.1 percent higher in the first quarter of 2000 than in the first quarter of 1999." Final Determination at 12. After apparently deeming these absolute increases in volume facially significant, the Commission determined that because the increase in volume of subject imports took place over a period of declining domestic consumption, the increase in market share of subject imports over the POI was also significant.[9]

The record reflects that the domestic producers' market share did in fact decline over the POI, as did domestic consumption overall.[10] Nippon does not dispute these facts. The record

---

[8] The quantity of imports of the subject merchandise from Japan was 181,287 short tons in 1997; 245,872 short tons in 1998; 336,961 short tons in 1999; and 98,854 short tons in the first quarter of 2000. Staff Report at Table IV-4.

[9] The Commission found that relative to consumption of TCCSS in the United States, "the quantity of imports of the subject merchandise increased by [    ] percentage points between 1997 and 1998; by [    ] percentage points between 1998 and 1999; and was [    ] percentage points higher in the first quarter of 2000 than in the first quarter of 1999." The Commission calculated that "the quantity of subject imports, relative to consumption of TCCSS in the United States increased by [    ] percentage points between 1997 and 1999, and continued to increase rapidly through the first quarter of 2000." Final Determination at 13.

[10] The Final Determination relied on Table IV-4 of the Staff Report, which shows that the market share (in terms of value) held by the domestic industry was as follows: [    ] percent in 1997; [    ] percent in 1998; [    ] percent in 1999; and [    ] percent in the first quarter of 2000; see also Staff Report at Table IV-3 (indicating total U.S. consumption in 1997 as [ 4,005,513 ] short tons; in 1998 as [        ]; and in 1999 as [        ], a net decline of [    ] short tons). The court notes that the Commission's finding of a net decline in total apparent U.S. consumption differs somewhat from the characterization found in the Staff Report. See Staff Report at IV-4 ("[t]otal U.S. consumption of TCCSS remained relatively stable during the period

(continued...)

shows that the amount by which domestic producers lost market share over the POI is significantly higher than the overall increase in non-subject import market share.[11] Thus, there is substantial evidence to support the conclusion that Japanese imports displaced a significant portion of the domestic industry's declining market share.

## 2. Regional Concentration of Competition

Notwithstanding evidence of the concurrent decline in domestic market share and consumption, Nippon claims that the Commission did not adequately account for characteristics of the TCCSS market that would preclude a finding that subject import volume was significant. Nippon does not, and indeed could not, assert that the Commission was *required* to conduct a market segmentation analysis. Rather, Nippon asserts that the Commission must support its finding of significance by at least taking into account regional concentration of shipments as a

---

[10](...continued)
examined"). Even if consumption is more properly characterized as remaining "stable" over the POI, this does not detract from the substantiality of the Commission's findings. Total U.S. consumption need not in all cases be in decline for an increase in the volume of subject imports to be significant. As the ultimate determination to be made is whether subject imports displaced domestic product, there is nothing to support the proposition that subject import volume cannot be considered significant where U.S. consumption is stable or even increasing, depending on other market indicators that speak to such displacement. For example, in Companhia Paulista de Ferro-Ligas v. United States, 20 CIT 473, 476-77 (1996), the court sustained the Commission's affirmative material injury determination where volume of subject imports rose by over 200 percent and the importers' share of domestic consumption increased substantially, notwithstanding evidence of stable or increasing domestic market share.

[11] The market share of domestic producers decreased by 7.7 percentage points over the POI. Market share of subject imports in terms of value are as follows: [      ] (1997); [     ] (1998); [      ] (1999); [      ] (first quarter of 2000), an overall increase of 5 percentage points. In comparison, non-subject market share in terms of value are as follows:     [        ] (1997); [        ] (1998); [        ] (1999); and [       ] (first quarter of 2000), an overall increase of 2.7 percentage points. See Staff Report at Table IV-4.

"condition of competition." In this case, the court agrees, as apparently does the Commission.[12]

Though ultimately deeming the TCCSS market "national," the Commission described the

conditions of the market in terms of regional concentration of competition. The Commission

stated:

> The market for TCCSS is a national market. While most domestic producers are
> located in the East and Midwest and many tend to ship much of their production
> to destinations near their plants, one U.S. producer . . . is located on the West
> Coast, and another . . . ships nearly half of its volume to purchasers located on the
> West Coast. With one exception . . . all domestic producers sell to purchasers on
> the West Coast, notwithstanding the fact that generally they must absorb the cost
> of transporting their shipments to these purchasers. Moreover, Japanese
> merchandise also competes throughout the United States. Indeed, only non-
> subject imports do not compete throughout the United States, as significant head-
> to-head competition in the West is limited to U.S. and Japanese TCCSS.

Final Determination at 10.

In its volume analysis, the Commission found that "imports from Japan to the West Coast

did not attenuate subject imports' negative impact on the domestic industry as a whole" for three

reasons: (1) the TCCSS market is a national market where "U.S. producers, although mainly

---

[12] The Commission does not argue that regional concentration of competition or
subdivisions of a market, either in product or geographic terms, cannot constitute a "condition of
competition" that may or may not vitiate a finding that subject import volume was significant.
There is no statutory requirement that the Commission conduct a "market segmentation" analysis
in any particular case. "[N]either the governing statute nor its legislative history requires
adoption of any particular analysis where a market may consist of several segments." Acciai
Speciali Terni, S.p.a. v. United States, 19 CIT 1051, 1056 (1995) (citing Copperweld Corp. v.
United States, 12 CIT 148, 162, 682 F. Supp. 552, 566 (1988)). That a "market segmentation"
analysis may not be required in all cases, however, does not absolve the Commission of its
general duty to analyze volume or price effects in terms of relevant conditions of competition.
Although the question of the importance of market segmentation often relates to *product* sub-
categories, see,
e.g., Encon Indus. v. United States 16 CIT 840, 842 (1992), it is clear that geographic
concentration of sales may also be a condition of competition potentially having an effect on the
significance of import volume and price effects.

located in the East and the Midwest, compete throughout the United States"; (2) subject imports increased over the period of investigation "not only in the West Coast but also in the remainder of the United States," while domestic shipments declined throughout the country; and (3) the only U.S. producer located on the West Coast experienced declines in shipments, price, and financial performance similar to those declines experienced by other domestic producers over the same period." Final Determination at 13-14.

### a. Attenuated Competition

Nippon claims that competition was so attenuated as to preclude a finding that the volume of subject imports was "significant" on the ground that domestic TCCSS producers concentrate on local sales. In support of its conclusion that domestic producers compete nationally, the Commission relied on data in the Staff Report regarding shipments to the West by domestic producers expressed as a percentage of each producer's total domestic shipments.[13] Each domestic producer was assigned a percentage that covered the entire POI rather than for each year. The Staff Report indicated that competition among firms was characterized by geographical concentration of sales: "[N]one of the [U.S.] firms possesses a dominating market share. However, U.S. producers are geographically spaced and tend to concentrate on certain

---

[13] The Staff Report describes domestic shipments to the West as follows: [



] Staff Report at III-2 n.2. Actual amounts shipped to the West by these producers were not indicated, nor were separate percentages available for each year under investigation. Many of the purchasers apparently have locations across the country and purchase volume was not listed by facility, so the court is unable to reconstruct domestic shipments by region simply by putting purchasers in groups according to region.

regions of the United States to minimize freight cost and shipping times, with some territorial overlap with other producers." Staff Report at III-2. The Staff Report did not indicate that this geographical concentration was of such extent that regions of the country are insulated from competition. That producers may concentrate on local sales is not inconsistent with the Commission's finding that producers compete nationally, and does not necessarily equate to insubstantial competition with Japanese imports.

There is no evidence that subject imports to the East and Midwest were insubstantial, much less non-existent.[14] Thus, although Japanese imports compete *more directly* with domestic product in the West, Japanese imports apparently compete throughout the country with all producers. Nippon has not pointed to any evidence that Japanese imports affected the East and Midwest in so attenuated a fashion as to preclude any adverse impact on the domestic industry as a whole in terms of volume or price. The court therefore declines Nippon's invitation to second-guess the weight the Commission assigned the volume of Japanese imports shipped to the West or to the rest of the country, nor will the court recalibrate the relative degree of intensity of competition across these regions.

**b. Correlation**

Nippon argues that the data disaggregated according to geographical zones of competition

---

[14] Nippon states that [     ] of Japanese imports are shipped to the West and the remainder is shipped to the East and Midwest. Nippon asserts that "subject import market share was very low [     ] in the Eastern United States – the region of the country in which six of the seven U.S. producers had their operations." Nippon Br. at 41. Nippon does not make clear to the court why this figure should be considered de minimis, or why it is so low that it could not have any demonstrable adverse effect on the domestic industry, especially in light of the Staff Report's finding that no single U.S. producer enjoys a dominant position in the U.S. TCCSS market.

shows a lack of correlation between the decrease in domestic market share and the increase of subject import volume. Nippon asserts the Commission majority's findings of a consistency in trends across the country is factually incorrect because (1) the two principal West Coast suppliers actually increased their shipments to the West from 1998 to 1999;[15] and (2) western areas of direct Japanese-U.S. competition fared better financially than the rest of the country, as evidenced by the relative performance of the only U.S. producer located on the West Coast.

Nippon's statement that the only two principal West Coast producers increased their shipments to the West from 1998 to 1999 is misleading in that, by omitting data for 1997, it avoids the question of whether shipments by these suppliers increased *overall* during the POI. Under Nippon's method for calculating these 1998 and 1999 figures, the total shipments to the West by these two producers in 1997 is higher than in 1998 or 1999.[16] Thus, there is a net decline in shipments by these two producers to the West over the POI, under Nippon's own

---

[15] Nippon states that shipments from these two producers, [                              ], "*actually increased* from about [            ] short tons in 1998 to [        ] short tons in 1999." Nippon Br. at 40 (citing Staff Report at III-2 n.2) (emphasis in original). Nippon apparently arrived at these figures by applying the percentage of total sales that were shipped by [            ] to the West over the POI, see note 13 supra, to the total amounts shipped in each year, and then adding the figures, [

].

[16] Applying Nippon's methodology to the data, the court finds that the two producers shipped a total of [        ] short tons in 1997. That is, [
                                              ]. The court notes that Commissioner Askey stated that "[t]he quantity of domestic shipments made by the two producers [
    ] increased from [      ] thousand short tons in 1997 to [      ] thousand short tons in 1999," yet provided no citation for the source of this data. Nippon does not indicate whether it adopts Commissioner Askey's calculations for 1997 or cite to any underlying source material that would indicate year-specific percentages for shipments to the West by each producer individually or by the industry as a whole.

methodology.

Even if the combined total of shipments to the West by these two producers did increase from 1997 to 1999, the record supports the Commission's conclusion that the financial performance of the U.S. producer located on the West Coast deteriorated as did the other U.S. producers, even if only somewhat less rapidly.[17]  The Commission is not under an obligation to find an *exact* correlation between subject import volume and financial performance, nor must the data be devoid of any inconsistencies.  The Commission's overall trend analysis of the data of a particular producer's shipments and financial performance is sufficient to support its conclusions.

Accordingly, the court finds that in isolation the Commission's determination with respect to the significance of subject import volume is supported by substantial evidence.  Under the "substantial evidence" standard of review, however, "the court must determine whether ITC's conclusions are supported by the evidence on the record *as a whole*." USX Corp., 11 CIT at 84, 655 F. Supp. at 489 (emphasis in original).  Therefore, this court must determine whether the Commission's conclusions with respect to price effects of subject imports is supported by substantial evidence.

---

[17] See Staff Report at Table VI-3.  Results of operations for [          ] show net declines in (1) Net Sales in short tons by quantity, [          ] in 1997; [          ] in 1998; and [          ] in 1999; (2) Operating Income, [          ] in 1997; [          ] in 1998; [          ] in 1999; (3) Gross Profit in terms of value, [          ] in 1997; [          ] in 1998; [          ] in 1999.  The data does show, however, a slight recovery in 2000 in terms of Operating Income and Gross Profit for this producer:  [          ] Operating Income was [          ] for the first quarter of 2000, as compared with [          ] in the first quarter of 1999, while Gross Profit in the first quarter of 2000, however, was  [          ] as compared with [          ] in the first quarter of 1999.  This slight upturn in financial indicators during the first quarter of 2000 does not detract from the Commission's findings regarding the overall financial performance of this producer during the POI.

**B.  Effect of Subject Imports on Domestic Prices**

Under 19 U.S.C. § 1677(7)(C)(ii), "[i]n evaluating the price effects of subject merchandise on prices, the Commission shall consider whether (I) there has been a significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."  Nippon claims that the majority's methodology of using aggregate pricing data skewed its underselling analysis and masked a lack of correlation between subject imports and the decline in TCCSS prices.  Nippon also claims that the Commission lacked substantial evidence to support its findings with respect to (1) price sensitivity; (2) the purchasers' use of Japanese pricing in negotiating with U.S. suppliers; and (3) lost sales and revenue allegations.

**1.  Methodology**

**a.  Underselling**

The Commission majority determined that the frequency and magnitude of underselling increased "dramatically" over the POI.  Final Determination at 16.  With respect to the frequency of underselling, the Commission majority found that "in 1997, four bids out of thirteen [30 percent of comparisons made] undersold the domestic producers' bids.  In 1998, seven out of sixteen [44 percent] bids undersold domestic bids.  By 1999 that number had risen to 21 out of

25 [84 percent] bids." Id. (citing Staff Report at V-22).[18]  The Commission further found that there was a significant increase in the magnitude of the underselling while "in 1997 Japanese bids were generally not underselling domestic bids.  In 1998, Japanese bids undersold domestic bids by 0.70 percent on average and by 1999, when subject import volume was greatest, the magnitude of underselling had risen to 5.77 percent on average."  Id.

Nippon challenges the ITC's finding of underselling on the ground that a particular purchaser[19] reported separate bidding information for three different tin-mill products purchased at each of its three facilities, while the other large purchasers submitted a unified pricing chart detailing a single bid price for each supplier.  Nippon argues that data for this purchaser was consequently "over-represented" on account of the Commission's methodology of counting "instances" of underselling without regard to the actual volumes purchased.  The Commission contends that its reliance on aggregate pricing data is consistent with Commission practice and has been sustained by this court.

(1)  Aggregate Pricing Data

As a preliminary matter, generally the Commission is not obligated to conduct a price comparison analysis that accounts for variations in sales volumes.  See, e.g., Metallverken

---

[18] In contrast, the Commission in the Preliminary Determination analyzed underselling by comparing weighted average f.o.b. prices and quantities for U.S. producers with those for Japanese producers.  See Preliminary Determination at Tables V-1 to 3.  The court also notes that in the Preliminary Determination, the Commission calculated prices from the discount rate, thereby facilitating comparison of the purchasers' purchasing history.  It is not clear why the Commission chose to revert to presenting data in terms of discount rate for some purchasers and price for others.  On remand, the Commission shall present pricing data in as consistent a manner as possible to facilitate review.

[19] This purchaser is [          ].

Nederland B.V. v. United States, 13 CIT 1013, 1024 (1989) (sustaining price comparisons based on largest quarterly sales). Nor is the Commission generally required to make a disaggregated analysis of material injury. See Copperweld Corp., 12 CIT at 166, 682 F. Supp. at 569. The court in Copperweld reasoned as follows:

> Section 1673d(b)(1) required that the [Commission] make and publish a final determination of whether a 'domestic industry' is materially injured by reason of the subject imports. The domestic industry is further defined as 'the domestic producers as a whole of the like product. 19 U.S.C. § 1677(4)(A). This language makes manifestly clear that Congress intended the [Commission] determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports.'

Id.

Nevertheless, where the Commission chooses to limit its underselling analysis to a subset of the pricing data available, the Commission must indicate the criteria it used for making the price comparisons. Neither the Final Determination nor the Staff Report explain the methodology used for making price comparisons. The Staff Report merely states that the price comparison table "shows a summary of the number of cases in which the Japanese product's final bid price was (1) below all final bids by the U.S. producers, (2) within the range of U.S. final bids, and (3) above all U.S. prices." Staff Report at V-22. At oral argument, the Commission explained that it based its underselling calculations solely on the number of individual bids from purchasers that purchased from both Japanese and domestic suppliers in a particular year, irrespective of volume, but it does not explain in the Final Determination or in its Response Brief its reason for doing so, or why it chose to reject the quarterly weighted average price calculations made in the Preliminary Determination. Why underselling was judged on such a narrow basis is not clear to the court. The Commission has not pointed to any previous case in

which it limited price comparisons in the manner it did here when it had access to a similar set of

specific pricing data. Thus, although the Commission generally has the discretion to choose a

methodology for analyzing underselling, where it chooses to limit the set of data for comparison,

the Commission is at least under an obligation to explain to the court the manner in which it

determined an "instance" of underselling, or in some way enable the court to review its

calculations and reasoning process. The Commission has not met this obligation in this case.

In addition, the Commission must account for differences in the way that data is reported

in order to ensure that its calculations are accurate. The Commission has the discretion to

fashion its questionnaires in whatever manner it sees fit. Once the data is received, however, the

Commission cannot ignore the manner in which the data is presented, and the Commission

cannot rely on the number of instances of underselling without first taking into account how the

underlying data is grouped. The Commission is not bound to present the data in the exact

manner in which they were reported. In this case, the Commission does not explain in the Final

Determination why a particular purchaser's three facilities were counted separately.[20] At oral

argument, the Commission explained that each the three facilities negotiated independently from

one another and from any central corporate headquarters, yet did not address whether this is the

case for the other purchasers who reported volume and pricing data. The court does not accept

this insufficient "post hoc rationalization." See U.H.F.C. Co. v. United States, 916 F.2d 689, 700

(Fed. Cir. 1990) ("Post hoc rationalizations of agency actions first advocated by counsel in court

---

[20] [
        ]

may not serve as the basis for sustaining the agency's determination.").[21]

(2)  Margin of Underselling

As stated above, the Commission found that "[i]n 1997 Japanese bids were generally not underselling domestic bids.  In 1998, Japanese bids undersold domestic bids by 0.70 percent on average and by 1999, when subject import volume was greatest, the magnitude of underselling had risen to 5.77 percent on average."  Final Determination at 16.  The Final Determination cites to an apparently non-existent "Table V-16" as support for its margin of underselling figures.  If this table existed, it appears that it was removed from the final version of the Staff Report, thereby precluding any meaningful review of the Commission's conclusions in this regard.  Furthermore, the Commission has not met its burden of establishing why these margins, assuming the figures are accurate, are significant.  For example, it may be that 2.156 percent -- the average margin of underselling over the POI  -- falls within the range of price differentials that purchasers on the whole indicated would induce them to switch suppliers, but the Commissioners did not analyze the magnitude of selling in relation to this information.  See Questionnaire, at Question IV-11.  Logically, a rapid rate of increase nonetheless may be immaterial if, for example, the margin never goes above a price differential that would cause purchasers to change suppliers to any significant degree.  Nor did the Commission analyze whether the undisputed lead-time advantage held by the domestic industry in fact translated into

---

[21] Similarly, the Commission does not explain why for this particular purchaser it counted separately each type of product purchased by an individual canning company.  Nor does the Commission explain whether other purchasers who provided separate data according to product type were similarly considered separately.  See, e.g., Staff Report at Table V-6 (purchaser provided separate data for "tin-plate" and "chromium-coated steel sheet"), & Table V-7 (purchaser provided data for "TCCSS-Double Rolled," "Chromium Cuatro Coils" and "TCCSS - Single Rolled").

an ability to maintain a price premium over imports, which may or may not account for the margin of underselling.[22]

The Commission need not analyze every piece of data it receives. Nevertheless, where information is available that would give meaning to the figures used to support a determination, the Commission should use it, or at least explain why such information is unusable. The Commission must be careful not to solicit information from purchasers regarding their decision-making criteria merely as a formality. Nor should the Commission invoke "rate of increase" to support its findings without providing some context that would reveal why the increase is significant for the purposes of determining material injury.

Therefore, on remand, the Commission shall explain its methodology for making price comparisons, and why this methodology was chosen over that used in the Preliminary Determination. It also shall present purchasing history in a way that will facilitate review of pricing/volume trends, e.g. weighted average prices, either industry-wide or by individual purchaser, on a quarterly or yearly basis. The Commission must present the data in a reasonably consistent manner with respect to purchaser and product grouping, as well as the expression of prices bid and paid. The Commission also must indicate the basis for its margin of underselling analysis, and indicate why this particular margin is significant.

### b. Correlation of Subject Imports to a General Decline in Prices

The Commission found that "the evidence shows a clear trend of generally declining

---

[22] The Staff Report indicates that "[l]ead times from U.S. producers varied between 6 and 12 weeks, with most producers reporting delivery within 6 to 8 weeks. For imports, lead times ranged from 2.5 months to 7 months, with 6 of the 11 importers reporting lead times in the 3 to 4.5 month range." Staff Report at II-13.

prices paid by purchasers over the period of investigation."[23]  Final Determination at 15.  The

Commission grouped the data into those purchasers reporting in terms of price actually paid and

those reporting the amount of discount from the annually announced list price.[24]  The

Commission found that (1) for four major purchasers, discounts from all sources of supply

(domestic, Japan, and others) increased for each period examined, and (2) for companies

reporting in terms of bid prices, "domestic prices were mixed between 1997 and 1998 . . . but

down across the board (except for [one purchaser] in 1999)."  Final Determination at 15 n.66.

The Commission also found that, in conjunction with this general decline in domestic prices,

"Japanese price movements were mixed between 1997 and 1998 . . . but down across the board

(except for [the same purchaser noted previously] in 1999."  Thus, the Commission linked the

general decline in domestic prices to overall trends in Japanese pricing.

Nippon does not dispute the Commission's finding that prices paid to domestic suppliers

generally declined over the POI.[25]  Rather, Nippon claims that the majority ignored detailed

bidding information submitted by the purchasers demonstrating that subject import prices could

not have negatively impacted domestic prices.  Nippon asserts that "the Commission's focus on

---

[23] The Commission noted that "[e]ven though the list price increased slightly from 1997 to 98, discount rates increased significantly in both years resulting in a net decline in prices.  In 1999, this trend was magnified by the fact that domestic producers were not able to increase the list price while discount rates continued to increase."  Final Determination at 15.

[24] Most domestic producers enter into annual supply contracts, the price of which is negotiated as a discount of a list price announced every autumn by one of the domestic producers.

[25] The court notes that the quarterly weighted-average pricing data compiled in the Preliminary Determination shows a decline in U.S. prices.  In the first quarter of 1996, U.S. prices were $706.02 (Product One),  $656.88 (Product Two), and $620.49 (Product Three).  By the third quarter of 1999, U.S. prices were $621.21, $622.71, and $577.31, respectively.

aggregate pricing data is fundamentally flawed, and ignores the lack of any correlation between purchases of subject import by *individual customers* and declines in domestic TCCSS prices." Nippon Br. at 18.

Nippon contends the following facts contravene a finding of such a correlation: (1) the largest purchasers of subject imports generally paid increased prices to domestic suppliers; (2) those who purchased no subject imports were able to secure price decreases from their domestic suppliers. Pricing trends for a particular large purchaser may indicate the lack of a correlation between the existence of competition with Japanese imports and a decline in prices paid by that particular purchaser.[26] Other large purchasers of TCCSS seem to have paid increased or unchanged domestic prices when lower-priced subject imports were present, and in many cases paid decreasing amounts where no subject imports in fact competed for the purchasers' business.[27] In the absence of a table with average industry-wide pricing, on a quarterly basis or otherwise, the court is unable to make a more thorough assessment of the Commission's conclusions. If the Commission deems the evidence apparently contradicting a finding of correlation somehow unimportant, the Commission must state its reasons for so finding. Clearly, a general decline in domestic prices is relevant to the extent it can be correlated to a decrease in

---

[26] Although [        ] consistently satisfied [        ] of its TCCSS requirements from Japanese suppliers, it apparently paid prices [        ] than other domestic TCCSS purchasers. Heinz Questionnaire Response, at Question II-1, C.R. Doc. 222, Pl. App. at Tab 8; Staff Report at Table V-4a, b, c.

[27] The record shows that [        ] obtained price decreases in each year of the POI notwithstanding the lack of any purchases from Japan. Staff Report at Table V-6. Similarly, data for [        ] show that U.S. producers were generally able to increase prices in 1999 notwithstanding the introduction of lower-priced bids from subject imports. Staff Report at Table V-2.

Japanese import prices. The Commission is not required in all cases to determine the

relationship between subject import competition and domestic prices on an individual purchaser

basis. Nevertheless, where the other data is so mixed and where data is available to determine

whether such a correlation existed for particular purchasers, and is relied on by respondents,[28] the

Commission must address the individual purchaser data in some manner.

## 2. Substantial Evidence

### a. Price Sensitivity

In describing conditions of competition in the Final Determination, the Commission

recognized that "[t]he record indicates that non-price factors such as product quality, product

consistency, and on-time delivery are very important." Final Determination at 8. The

Commission found, however, that "the record also reflects that during annual contract

negotiations, price is a critical factor. The market is therefore characterized by a high degree of

price sensitivity." Id. The Commission does not cite any record evidence to support its

conclusion. In analyzing price effects of the subject imports, however, the Commission specified

that (1) the domestic TCCSS market is concentrated with respect to both purchasers and

suppliers, and (2) "price, in the form of discount rates, is negotiated intensely, often down to the

hundredths of one percent." Final Determination at 15. Nippon claims these criteria are not

meaningful, and further claims that the Commission's finding of price as a "critical" factor is

_____

[28] See 19 U.S.C. § 1677f(i)(3)(B) (1994); see also Altx, Inc. v. United States, 167 F. Supp. 2d 1353, 1359-60 & n.7 (Ct. Int'l Trade 2001) (finding that under the new statute, the Commission is required to respond to parties' material and reasonable arguments with a "reasoned explanation").

contradicted by the purchasers' testimony at hearings and in questionnaire responses, according to which reliability and quality were repeatedly cited as most determinative of their purchasing decision, whereas price was ranked seventh in order of importance.

### (1)  Market Concentration and Price Specificity

The Commission did not make clear why the fact that there are a small number of purchasers and suppliers is necessarily indicative of price sensitivity, as markets that are not particularly concentrated may still exhibit a high degree of price sensitivity for any number of reasons.  Nor is it apparent why the degree of price *specificity* in negotiations would be necessarily indicative of price *sensitivity*, since the Commission is presumably not precluded from finding a lack of price sensitivity in markets that do not exhibit similar degrees of price specificity.[29]  In light of the lack of any precedent in which these two factors alone or in combination supported, without more, a finding of price sensitivity, the court finds that the Commission's explanation for its finding of price sensitivity insufficient.

### (2)  Non-price Factors

Nippon's assertions that purchaser testimony and questionnaire responses reveal that price is not considered the most important factor miss the mark.  A finding of "price sensitivity"

---

[29] The Commission cited several documents in support of its price specificity finding, including one May 18, 1998 internal document of [      ] in which [      ] proposed discount rate of [      ] percent is contrasted with other suppliers' discount rate of [ ] percent.  Final Determination at 14 n.65.  The Commission explains in its brief that "[w]hen a difference as small as [      ] in price means potentially losing substantial amounts of business, it was reasonable for the Commission to conclude that this industry is price sensitive." ITC Br. at 36.  The Commission's statement is misleading because the bids discussed are expressed in discount rate, rather than straight price per ton.  Under the Commission's reasoning, evidence of prices expressed in amounts to the dollar would in all cases support a finding of price sensitivity.

is not precluded by the fact that price is not the *most* important factor. For example, the court in

Acciai, 19 CIT at 1059-60, found that the Commission's finding as to importance of price was

supported by evidence where the only two purchasers of a particular import, though not listing

price as the most important factor in decision-making, listed price as "a very important factor,"

and indicated that a five to ten percent rise in import price would cause them to switch to

domestic producers.

In this case, unlike in Acciai, the Commission did not evaluate purchaser responses

regarding the amount of a price increase necessary to induce them to switch suppliers. See

Purchaser Questionnaires at Question IV-8. Nor did the Commission account for the role of non-

price factors in purchaser decision-making in any meaningful way.[30] In making its price

sensitivity finding, rather than evaluate purchasers' assessments of non-price factors such as on-

time delivery or product quality, or whether these other factors actually drove their decision to

switch suppliers, the Commission simply noted that other non-price factors were also considered

"important." [31] The Commission cannot determine price sensitivity in a vacuum. The focus of

_____

[30] The Commission did discuss a particular domestic producers' on-time performance in terms of whether the declining health of the domestic industry could be attributed to subject imports or some other cause. See discussion, infra, section C.

[31] The record indicates that seven of thirteen reporting purchasers described price as "very important," and six described price as "somewhat important." Staff Report at Table II-4. The record also indicates that other factors ranked higher than price, e.g., "delivery time" was listed as "very important" by nine purchasers and "somewhat important" by four; and all responding purchasers indicated "quality" as "very important." Id. Overall, price was ranked seventh of approximately ten factors. It is not appropriate for the court to make an assessment of the weight that should be given these data, if any. Nevertheless, where results are, as here, mixed with respect to purchaser assessments of the relative importance of price in decision-making, the Commission should evaluate the other factors cited by purchasers, or at least the amounts they cite as sufficient to warrant changing suppliers. The Commission may articulate a reason why

(continued...)

the price sensitivity inquiry is apparently on the degree to which price is a determining factor in the mind of the purchaser in making its purchasing decision. Therefore, if the Commission chooses to rely on price sensitivity to support its price effects determination, it must assess other aspects of the TCCSS industry that would tend to reduce if not entirely vitiate, the importance of price in purchaser decision-making. In this case, it is insufficient merely to acknowledge that non-price factors are considered "very important" without discussing the nature of these factors in the industry or relating them to its overall determination, as such factors may eclipse the importance of price in purchaser decision-making.

### b. Negotiating Practices

The Commission found that "the record reflects that the aggressive pricing by importers of Japanese TCCSS has been used by at least some purchasers in their price negotiations with the domestic suppliers, and Japanese supply is recognized as an important factor affecting U.S. prices." Final Determination at 16. The Commission deemed not credible testimony by four large purchasers that imports from Japan have no effect on TCCSS prices. The Commission found that, contrary to a particular purchaser's testimony, negotiations with importers "often take place simultaneously with domestic supply negotiations," citing this purchaser's documentation referencing negotiations with Japanese suppliers that were taking place in the fall and winter, while negotiations with domestic suppliers were still ongoing.

The court may not question the weight the Commission assigns to particular testimonial

---

[31](...continued)
the purchasers' assessment of decision-making criteria is not to be accorded weight, but without an analysis of these factors, a thorough review of the Commission's determination in this regard is impossible.

evidence.  Nevertheless, the Commission's rejection of the purchasers' *entire* testimony is not

supported by adequate reasoning.  It is not inconsistent for domestic producers to negotiate with

purchasers at the same time as Japanese producers, yet in their negotiations remain or at least

consider themselves insulated from competition from Japanese pricing.  Thus, even if the

purchaser inaccurately represented the timing of negotiations,[32] the Commission must still

address the documentary evidence that supports the purchaser's contention and fundamental

point that negotiations run on separate tracks according to different procedures and criteria.[33]

First, the Commission does not address evidence of supply agreements whereby domestic

producers are obligated to match prices with only other domestic producers.[34]   Second, the

---

[32] The court notes that there is in fact some inconsistency in this purchaser's representations to the Commission.  In [          ] questionnaire response, it indicated that:
 [




                         ].

Questionnaire Response, C.R. Doc 243, 244, Pl. App. Tab 12 at 18-1 to 2 (emphasis added).

   [33] [









        ]

   [34] See, e.g., [                              ] Supply Agreement,  C.R. Doc 208, Pl. App. Tab 16 at Exh.
                                                                         (continued...)

Commission has not assessed whether the acknowledged difference in lead-times cause

purchasers to consider foreign supply "supplementary," and allocate predetermined volumes to

foreign and domestic supply sources. See Testimony of Mr. Rourke of B-Way, Hr'g Tr. at 220

("We also will mitigate the risk by choosing a finite number of specifications to give an off-shore

source. And typically in our case it may be heavier runners, things that will supplement other

specifications that we're getting from others.").

In addition, the Commission sidesteps the question of whether Weirton's internal

documents belie its contentions that it adjusted pricing according to competition from Japanese

imports. The Commission had solicited from Weirton at the public hearing documents to

support its claim that subject import pricing damaged its negotiating leverage. In its submitted

response, Weirton conceded that "the competitors listed on the [competitive pricing memoranda

sent from the sales department to the pricing department] are always other domestic firms." See

Affidavit of David Gill, Petitioner's Post-hearing Br. at Exh. 20.[35] This documentary evidence is

consistent with purchasers' testimony that each year domestic producers negotiate only within a

---

[34](...continued)
1, which includes a provision whereby [


]. The Commission does not discuss whether this type of agreement is
typical in the TCCSS industry.

[35] Weirton submitted to the Commission its internal "Competitive Price Allowance"
sheets for several purchasers during the POI. Weirton lists the following as its "Competition":
for [      ] in 1997, 1999 and 2000 [            ], but only  [          ] in 1998; for [        ] in
1997, 1998, and 2000, [              ], but also [           ] in 1999;  for  [
                          ] in 1997 [        ], and in 1999 [          ];  in for [      ] in 1998,
1999 and 2000 [            ], but also [      ] in 1997; and for [          ] in 1999 [                ].
See Petitioner's Post-hearing Br. at Exh 2.

set range of a list price announced by a particular domestic producer, and that foreign prices are

not established until after domestic contracts have been signed.  Hr'g Tr. at 202-203.  In an

affidavit, however, Weirton stated that this evidence should be discounted because a particular

purchaser indicated the availability of lower priced Japanese imports during negotiations.

Weirton Post-Hearing Br. at Exh 20.  The Commission deemed the affidavit credible "because

the statements made therein about the intentions of two major purchasers to increase their

purchases of Japanese TCCSS due to its low prices is borne out by the purchasing history of

these two companies.[36]  As the Commission mentions the purchasing history of only one

purchaser, the court cannot speculate as to how the Commission viewed the other's purchasing

history to support Weirton's representations.

While the court does not question the veracity of the representations in the affidavit, or

the weight the Commission chooses to assign it, the reasoning the Commission extracts

therefrom is flawed.  That a purchaser switched to a foreign source of supply does not necessarily

mean it did so for price reasons.  Also, simply because a purchaser indicates to a producer the

availability of lower priced subject imports does not negate the evidence of Weirton's pricing

practices.  Weirton's pricing department apparently derives its pricing allowance range solely

according to pricing data of domestic producers submitted by its sales department.  There is no

evidence that Weirton somehow abandoned its way of calculating the pricing allowances, or that

the documents it submitted are somehow inaccurate.  Although given the opportunity, Weirton

did not provide any evidence that it actually had to bid below the calculated range, or any other

---

[36] The Commission noted only that "[s]pecifically, in 1999 [      ] increased its purchases of Japanese TCCSS by [      ] short tons . . . (while reducing its purchases from domestic suppliers by [      ] short tons)."  Final Determination at 17 n.71.

evidence that the sales department submitted foreign pricing data to the pricing department. If

the ultimate question is whether lower Japanese prices forced domestic producers to lower prices

or prevented them from raising prices, the Commission cannot ignore, and must evaluate on

remand, evidence showing that the petitioner set its prices within a range established only by

domestic prices.

The Commission did rely on four internal negotiating memoranda. Only one of these

memoranda indicates that lower-priced Japanese imports were taken into consideration during

negotiations with domestic suppliers.[37] The second refers only generally to "foreign suppliers,"

and the final two discuss only the effect of Weirton's filing of an antidumping petition on the

supply of Japanese imports. The Commission may rely on documentary evidence to determine

the extent to which subject import pricing factored into domestic supply negotiations.

Nevertheless, if the Commission chooses to rely on this type of evidence, it must make an

affirmative assessment of the documentary evidence in its entirety, rather than selecting a few

documents without explaining why they exemplify industry practice, or why they otherwise

should be accorded weight.

### c. Lost Sales and Revenue

Lastly, the Commission stated that "the adverse effect of subject imports is also reflected

in, among other things, [the fact that] four purchasers confirmed that a particular producer either

---

[37] The relevant text of the memo cited by the Commission is as follows: [

        ] [      ] Memo (September 4, 1998), C.R. Doc. 208, Pl. App. at Tab 17. The
context of this memo reveals that the writer was discussing sourcing supply in light of labor and
performance concerns, and pricing of imports appears incidental. The Commission also omits
that in 1999 this purchaser, although purchasing from a Japanese producer for the first time, in
fact increased its purchases from Weirton from [      ] tons in 1998 to [      ] tons in 1999.

had been forced to reduce its price to these purchasers because of lower prices by sellers of Japanese TCCSS or had lost a sale outright." Final Determination at 17-18. Evidence of actual lost sales and lost revenues is not required to support a finding that the domestic industry is materially injured by reason of the subject imports. Companhia Paulista, 20 CIT at 479-80 (citing Acciai, 19 CIT at 1056-57 (noting that Commission not required to rest its decision on lost sales or lost revenues, as these may be only possible signals of impact)). Although evidence of lost sales and revenue may be probative, the lack of such evidence ordinarily will not vitiate a Commission determination. Stalexport v. United States, 890 F. Supp. 1053, 1076 (Ct. Int'l Trade 1995); Metallverken, 13 CIT at 1025 (citing USX, 11 CIT at 86, 655 F. Supp. at 491). This is not to say, however, that where the Commission chooses to rely on findings of lost sales/revenue, it need not support such findings with substantial evidence.

The Commission fails to indicate the data upon which it relied in making its lost sales/revenue conclusions, or any context which would reveal why these four confirmations were given weight. Presumably, the Commission derived "four confirmations" from the Staff Report.[38] Nippon alleges that the purchaser may have been confused about whether the lost sale had to be to a Japanese supplier. The record shows, however, that the Commission took steps to make sure the purchaser understood the nature of the allegation. See Notes (May 12, 2000; June 7, 2000; July 5, 2000) C.R. Docs. 66, 133, 260. Nippon also alleges that one confirmed lost sale

---

[38] The Staff Report indicates: "The Commission requested U.S. producers of TCCSS to report any instances of lost sales or revenues they experienced due to competition from imports of TCCSS from Japan since 1997. Of all responding U.S. producers, only [      ] reported specific data of reduced prices, roll-backs of announced price increases, or lost sales to Japan. See Staff Report at V-22. Five out of six purchasers disagreed with its lost sales allegations, while one out of four disagreed with its lost revenue allegations." Staff Report at Tables V-14 and V-15.

was "an impossibility" because the Japanese producers supplied different facilities than the U.S.

producer alleging lost sales.[39]  Nippon overlooks the fact that each of this purchaser's facilities in

fact received bids from Japanese and U.S. producers.  "Lost sales allegations refer to the situation

in which the domestic industry is unable to make a sale because of the presence of lower priced

imports."  Copperweld, 12 CIT at 169 n.15, 682 F. Supp. at 572 n.15.  Thus, it is not

"impossible" for this producer to report as a "lost sale" a sale that was ultimately awarded to a

Japanese producer.

Nevertheless, the data in the lost sales allegation do not reflect the purchasing history data

provided for this particular purchaser.[40]  Although the Commission followed up on the lost sales

allegation with the purchaser in question, the Commission does not indicate that there was in fact

a competing import price for that sale.[41]  Furthermore, the absolute number of lost sales is not, by

itself, meaningful.  Rather, the Commission must indicate in the Final Determination how many

---

[39]  Nippon claims that the Japanese mills "never supplied the same facilities as [        ] and never competed for [this purchaser's] sales with [          ]."  Nippon Br. at 33.

[40]  The Staff Report indicates that [        ] alleged that:  (1) it lost a sale to [        ] in October of 1998, (2) that the quantity it allegedly lost was [          ] short tons, (3) that its rejected U.S. price was [      ] per short ton, and (4) the accepted import price was [          ], for a total alleged lost sales amount of [          ].  See Staff Report at Table V-14.  There is no sale to Japanese producers corresponding to a volume of [          ] short tons.  The Purchasing History for [      ], however, reveals that [        ] did not bid below [        ] at [          ].  See id. at Table V-4a, c.  The only bid approximating [        ] was in 1999 when [        ] bid [      ] in 1999, when Japanese producers overbid [        ] at [        ], and were not awarded any volume.  See id. at Table V-4b.  It is thus unclear which sale [          ] lost sale allegation is actually referencing.  On remand, the Commission shall specify which lost sale it is referring to in its lost sales discussion, and why that particular lost sale is significant.  The Commission should not force the court to engage in guesswork.

[41]  See Trip Report at 4 ("I did not understand the allegation regarding [        ] where there was no competing import price.")

allegations were actually made, or at least the volume of the individual confirmed lost sale(s) it

relies on, in order to give the court a basis for reviewing why the Commission deemed the lost

sale(s) significant.  Therefore, on remand, the Commission shall indicate the specific data upon

which it relied in light of the corresponding purchasing history, and explain why such data are

significant.[42]

---

[42] Nippon also asserts that "the majority also cites three unconfirmed lost sales allegations as further evidence of the adverse impact of subject imports."  The Commission discounted purchaser testimony disputing the lost sales/revenue allegations with circular reasoning, stating that "the evidence of lost revenue and sales undermined the credibility of purchaser testimony and Respondents' argument that Japanese and domestic suppliers do not compete for the same business."  Final Determination at 18 n.72.  Nevertheless, Nippon overstates its case, as it is clear that the Commission did not "rely" on unconfirmed sales.  The Commission merely noted its concerns about the veracity of the purchasers who disagreed with the lost sales allegations, and did not convert these unconfirmed lost sales into "confirmed" lost sales.  Thus, the Commission need not revisit the issue of unconfirmed lost sales allegations, but may choose to do so.

### C. Causation

After assessing the significance of volume, price effects, and impact of the LTFV imports on the domestic industry, "the Commission must take an analytically distinct step to comply with the 'by reason of' standard: the Commission must determine whether these factors as a whole indicate that the LTFV imports themselves made a material contribution to the injury." Gerald Metals, Inc. v. United States, 27 F. Supp. 2d 1351, 1356 (Ct. Int'l Trade 1998). In addition, the court in Taiwan Semiconductor, 59 F. Supp. 2d at 1329-31, held that "the Commission must not attribute the harmful effects from other sources of injury to the subject imports and must adequately explain how it ensured not doing so." See also Statement of Administrative Action, H.R. Doc. No. 316, 103rd Cong., 2nd Sess. (1994), reprinted in Uruguay Round Agreements Act, Legislative History, Vol. VI, at 851-52 (Commission must "ensure that it is not attributing injury from other sources to the subject imports.").

Nippon claims that the majority failed to account adequately for: (1) declining domestic producer reliability; (2) rapid purchaser consolidation; and (3) non-subject imports. Nippon, however, misstates the Commission's obligations with regard to assessing alternative causes of injury. It is not sufficient that the other putative sources of injury had a "demonstrable effect" on the ability of U.S. producers to raise prices. See Nippon Br. at 44. The Commission need not find that the alternative causes entirely *negate* the possibility of subject imports' having *any* adverse effect on domestic pricing. Rather, the Commission must determine whether these alternative sources are of such extent and magnitude that they preclude a finding that the subject imports made a *material* contribution to the injury. Taiwan Semiconductor, 59 F. Supp. 2d at 1329 ("[I]n some cases, other sources of injury 'may have such a predominant effect in producing

the harm as to . . . prevent the [subject] imports from being a material factor.") (citing Gerald

Metals, 27 F. Supp. 2d at 1356 n.8).

### 1. U.S. On-Time Performance and Quality

Nippon does not dispute that the domestic industry's performance deteriorated between

1997 and 1999, in terms of employment, capacity utilization, shipments, and profits. Nippon

claims, however, that the Commission's attribution of these effects to subject imports is in error

on the ground that the majority ignored evidence that purchasers were forced to requisition

increased quantities of imported TCCSS due to declining domestic producer reliability. In its

impact analysis, the Commission acknowledged that there was documentary evidence that

showed domestic producers' on-time performance was poor during the POI.[43] The Commission

stated, however, that it was "not persuaded by respondents' inconsistent and contradictory

testimony that purchasers turned to Japanese sourcing solely because of non-price reasons."

Final Determination at 26. The Commission's basis for rejecting all "respondents' testimony"[44]

regarding on-time performance was an inconsistency in U.S. Can's testimony:

> U.S. Can claimed that it began shifting more business to Japanese suppliers
> because of their willingness to supply its increasingly global operations, and the

[43] In documents submitted by U.S. Can in response to Chairman Koplan's request, [    ] on-time performance in 1998 was [        ], and in 1999 was [        ], which apparently falls below contractual requirements, thereby triggering price reductions. See U.S. Can Questionnaire Response, C.R. Docs. 243-44, Pl. App. at Tab 12 Attachment F-1.

[44] Apparently the Commission considers purchaser testimony to be "respondents' testimony."

shift accelerated in 1999 due to domestic suppliers' poor performance.[45] . . .
Thomas Yurco of U.S. Can testified at the Commission's Preliminary Conference
that his company had reduced volume purchased from Weirton because of
delivery problems and had switched to other domestic suppliers rather than to
imports from Japan or other nonsubject country sources. [No citation.] However
U.S. Can's purchasing history shows that in 1999 the company reduced its
purchases from domestic producers . . . while it increased its purchases of
Japanese TCCSS . . . .[46] Thus, contrary to the statements in the . . . internal
memorandum cited above (and contrary to the representations made by Mr. Yurco
to Weirton officials), other U.S. producers . . . were not the beneficiaries of
Weirton's alleged delivery problems in 1999.[47]

First, the court is unable to assess the Commission's reasoning fully because, in the Staff

Report's Table describing U.S. Can's purchasing history, two sets of pricing data are

inexplicably given for U.S. Steel, while Weirton is not listed at all. See Staff Report at Table V-

3. Second, Mr. Yurco specifically testified at the Preliminary Conference that U.S. Can

increased its purchases from Japanese suppliers. Preliminary Conf. Tr. at 94, P.R. Doc. 18, Pl.

App. at Tab 3. He explained that foreign producers tend to be more globally-oriented, and that it

---

[45] The Commission cites to the Preliminary Conf. Tr. at 95 and an internal U.S. Can memo dated February 1, 2000.

[46] The Commission specified that U.S. Can "reduced its purchases from domestic producers by [        ] short tons while it increased its purchases of Japanese TCCSS by approximately [        ] short tons." Final Determination at 26. Total domestic purchases by U.S. Can in 1998 were [        ] short tons compared to [        ] short tons in 1999, a difference of [        ] short tons. U.S. purchases from Japan increased from [        ] short tons in 1998 to [        ] short tons in 1999, a difference of [        ]. The Commission apparently inadvertently included U.S. Can's purchases from Sollac of France in its calculations for Japan, as total foreign purchases in 1998 were [        ] short tons in 1998, compared to [        ] short tons in 1999, a difference of [        ] short tons.

[47] The text of this memo reads as follows: [

] Pl. App. at Tab 16, Exh. 3.

had on-time delivery problems with Weirton, Bethlehem, and Wheeling-Pitt. Id. at 95-96.

Nowhere in Mr. Yurco's Preliminary Conference testimony does he represent to the Commission

that U.S. Can shifted sourcing from Weirton to other domestic producers. His testimony at the

Preliminary Conference is therefore consistent with his testimony at the Final-Phase Hearing.

See Hr'g Tr. at 201-08. Apparently, the Commission has conflated U.S. Can's testimony and

purchasing history with that of Silgan.[48]

Third, that other U.S. producers may or may not have benefitted from Weirton's alleged

delivery problems says nothing about the extent to which U.S. producers as a whole suffered

from delivery problems or whether purchasers actually switched for non-price reasons. The

Commission does not address either the fact that U.S. Can's communications with Weirton

continually reference on-time performance problems, or the specific performance rates provided

to the Commission by this purchaser. See Post-Hearing Documentation, C.R. Doc. 208, Pl. App.

at Tab 16. Nor does it discuss whether Weirton satisfied its performance requirements in its

---

[48] Mr. Owen of Silgan testified as follows:
[



                                                ]
Hr'g Tr. at 209-10. Silgan's purchasing history supports this testimony: in 1998, it purchased a
total of [      ] short tons, which increased to [      ] short tons in 1999, even though it
reduced purchases from Weirton ([      ] short tons in 1998 compared to [      ] short tons
in 1999), while increasing purchases from [          ]. Japanese purchases went from [
] short tons in 1998 to [      ] short tons in 1999. Staff Report at Table V-9.

supply agreement with U.S. Can.[49]  The Commission may determine that such performance requirements are not in fact industry custom or routinely adhered to, but without any such assessment, the court cannot review adequately its decisions regarding shift in supply.  Fourth, the Commission rejects testimony regarding on-time performance problems, but says nothing about the prevalence of problems with quality among domestic TCCSS producers.  As its reasons for rejecting purchaser testimony are not well-founded and are otherwise incapable of being reviewed properly by the court, the Commission must assess on remand the evidence regarding domestic performance.[50]

### 2. Purchaser Consolidation

In the Final Determination, the Commission rejected the Respondents' claim that rapid purchaser consolidation rather than Japanese imports actually caused the general domestic price decline. The Commission based its rejection on the finding that the effect that consolidation among TCCSS purchasers had on domestic prices was "slight" because: (1) "with only seven producers, there is a similar degree of concentration between the major U.S. purchasers and the domestic producers;" (2) the most significant buyer consolidation occurred between 1990 and

---

[49] [

] Letter (January 30, 1998), C.R. Doc. 208, Pl. App. Tab 16 at Exh 9.

[50] To the extent this affects the Commission's price effects analysis, the Commission shall consider these matters in that context as well.

1996, during which time consolidation did not "substantially affect prices;" and (3) there had been no significant increase in purchaser consolidation during the POI. Final Determination at 20-21.

The record shows that purchaser concentration increased from 1990 to 1999, although much more rapidly mid-decade than in the latter part of the decade.[51] During the POI, the top six purchasers maintained roughly three-quarters of the market. In contrast, the number of domestic producers remained at six from 1990 until 1997, when Ohio Castings entered the TCCSS market.[52]

The question underlying the issue of purchaser consolidation in this case is whether the purchasers have increased their leverage to an extent that subject imports could not have been a material cause of the injury. The fact of a similar degree of concentration across purchaser and producer sectors during the POI, or that no significant consolidation took place during the POI, says nothing about whether the relative bargaining power has changed over time to have an effect on price. In some cases, events occurring before the POI may have a *current effect* on the industry dynamics during the POI. Therefore, the Commission's second finding regarding pricing trends during periods of purchaser consolidation is crucial.

---

[51] The Commission relied on purchaser concentration data provided by Weirton that showed the top 6 purchasers represented approximately 30 percent of the market in 1990; 30 percent in 1991; 35 percent in 1992; 42 percent in 1993; 45 percent in 1994; 56 percent in 1995; 71 percent in 1996; 76 percent in 1997; 78 percent in 1998; and 75 percent in 1999. See Petitioner's Post-Hearing Br., Exh. 13. Thus, the record supports the Commission's finding that the most significant purchaser consolidation occurred between 1990 and 1996, and justifies its focus on measures of price stability during this period.

[52] Nippon does not claim that the entry of Ohio Castings into the TCCSS market accounted for the price decline of the domestic industry during the POI, as Commissioner Askey maintained in her dissent. See Commissioner Askey Dissent at 23.

The Staff Report indicated that "[a]s a result of [purchaser] consolidations, smaller purchasers have indirect access to discounts that once were reserved for the larger purchasers." Staff Report at V-7.[53] The Commission's review of pricing data from 1990 to 1996 led it to conclude otherwise. Rather than analyze industry-wide pricing data to support its conclusion that domestic pricing remained relatively unaffected by the rapid purchaser consolidation from 1990 to 1996, the Commission relied on Weirton data showing that its weighted average price remained within a "narrow range" during this period.[54] It is within the Commission's discretion to draw conclusions about an industry from the pricing trends of a particular producer occupying a substantial portion of the market. The record reveals that Weirton itself, however, viewed purchaser consolidation during the entire decade as having an effect on its bargaining power and pricing. In a Weirton Steel Mill Visit Report, ITC officials state that Weirton represented that "Weirton purchaser base went from approximately 80 in 1989 to approximately 6 [in 2000]. The

---

[53] The Staff Report specified that:

One purchaser, [        ], noted that the price growth rate has fallen. Prices increased by 5 percent in 1994, increased 2.75 percent in 1997, then increased 3.75 percent in 2000. [

]

Id. The Staff Report did not discuss whether there was a relationship, either direct or inverse, between purchaser consolidation and industry-wide pricing trends from 1990 to 1999.

[54] Weirton's weighted average prices were approximately as follows: [

] Weirton's Post-Hearing Br. at Exh. 13. The Commission does not explain the apparent inconsistency in deeming this a "narrow range" of pricing, when in its price sensitivity argument it maintains that a small fraction of a discount rate would induce a purchaser to switch suppliers. Nevertheless, price stability over time is not necessarily dictated by purchasers' criteria in decision-making.

result was a *greatly diminished power to negotiate and a decrease in price.*" Memorandum from Christopher Cassie and Sandra Rivera to File (May 22, 2000), at 5, C.R. Doc. 67, Pl. App. at Tab 22 (staff notes) (emphasis added). The Commission did not state that the ITC investigators' findings were incorrect.

Nevertheless, the court finds no error here. The Commission's interpretation of the data it receives is not limited by the interpretation of the party providing them. Nippon has not pointed to evidence that industry-wide pricing trends from 1990 to 1996 are inconsistent with Weirton's submitted pricing data for this period. Nor has Nippon asserted that Weirton's pricing actually declined over this period. For the purpose of discounting purchaser consolidation as having a "predominant effect" in producing injury, it is sufficient in this case, where there is minimal evidence to the contrary, for the Commission to rely on evidence that prices for a substantial segment of the industry remained relatively stable over time in the face of rapidly increasing purchaser concentration.

### 3. **Non-Subject Imports**

The Commission rejected the contention that non-subject imports accounted for the decline in domestic pricing based on its finding that "[a]lthough non-subject imports were a significant factor in the domestic market during the period of investigation, subject imports [1] grew more rapidly and [2] were generally priced more aggressively." Final Determination at 22. Nippon argues that non-subject import volume would have had a significantly larger competitive impact than subject import volume because the majority of domestic shipments were in the Eastern United States, in direct competition with all non-subject competition. Nippon also argues that the "ITC staff's own comparison of subject and non-subject prices demonstrates that

subject imports largely oversold non-subject imports."  Reply Br. at 14.

### a.  Non-Subject Import Volume

With respect to non-subject import volume, the Commission discounted non-subject imports as an alternative source of injury on the ground that subject imports' market share was "comparable" to the non-subject imports' market share where "[b]y 1999, the volume of imports from Japan alone nearly equaled the volume of imports from all other sources combined."  Final Determination at 22.  The Commission in describing "conditions of competition" had noted that "while non-subject imports accounted for a somewhat greater proportion of total U.S. market share than subject imports during most of the period of investigation,[55] subject imports' total market share increased at a substantially greater rate than non-subject imports."  Final Determination at 11.  As stated in the discussion above regarding volume, Japanese imports account for at least some of the decrease in market share held by the domestic industry.  Although this may be sufficient for the purpose of finding subject import volume "significant," the Commission must still address whether non-subject imports constitute a predominant source of injury in light of conditions of competition.  See Taiwan Semiconductor, 59 F. Supp. 2d at 1329.  The Commission acknowledged in its conditions of competition discussion that non-subject imports were not sold in the West, yet does not analyze this condition in response to Respondents' alternative source of injury claim.  Even if subject and non-subject market share levels are "comparable" on the whole, non-subject imports are not necessarily precluded from constituting the predominant source of injury where, as in this case, they are concentrated in

---

[55] The record shows that the market share of non-subject imports was greater than that of subject imports at all times during the POI except the first quarter of 2000.  See Staff Report at Table IV-5.

regions to which most domestic shipments were made. That Japanese import volume grew at a higher rate of increase does not relieve the Commission from assessing characteristics of the industry that may or may not show a correlation between non-subject imports and injury to the domestic industry.

### b. **Non-Subject Import Pricing**

With respect to non-subject import pricing, the Commission specified that "high-quality subject imports frequently undersold high quality non-subject imports and even undersold lesser quality non-subjects as well." Final Determination at 22. For support of this conclusion, the Commission cites to all of the pricing tables – i.e., "Tables V-1 through V-13" – and instructs the reader to "compare" all of these tables with Table II-6. The Commission then indicated that:

> A summary of these data indicates that TCCSS from Canada, Germany, and the Netherlands (countries that, like Japan, are sources of high quality TCCSS) were priced higher than TCCSS from Japan in five of seven comparisons. In 1997-1998, imports from Japan generally oversold imports from other non-subject countries (those whose principal sales advantages are favorable prices and/or discounts), but in 1999-2000, imports from Japan matched or undersold imports from these countries in half of the comparisons.

Final Determination at 22-23 n.84 (citing Staff Notes, Requested by Commissioner Okun's staff (January 30, 2001, revised July 31, 2001) ["Staff Notes"], see Pl. App. at Tab 24). The Staff Notes memo indicates that the latter group is comprised of China, France, Brazil, Korea, Mexico, Norway, Belgium, and Taiwan, but does not explain whether the countries were grouped according to quality or volume[56]

---

[56] It appears that this manner of grouping parallels that found in Weirton's Post-hearing Br. There, Weirton grouped the countries in this manner based on the fact that Canada, Germany and the Netherlands are the only three countries (besides Japan) whose exports to the United States exceeded 50,000 tons in 1999.

First, the Commission does not make clear why it chose to distinguish between "countries that are sources of high-quality TCCSS" and "those whose principal sales advantages are favorable prices and/or discounts," or its basis for grouping the countries in the way that it did. The Commission does not cite to anything that would enable the court to review the reasons for this choice. Nor does the Commission explain the apparent inconsistency in its grouping in this manner with that described in purchaser testimony and the Staff Report. Mr. Owen of Silgan testified as follows: "If we did choose to purchase on the basis of price, Silgan would pursue imports from Brazil, Korea, or Taiwan or other countries that aggressively solicit orders from us at prices well below any that we see from the U.S., Japan, Europe or Canada." Hr'g Tr. at 213. The Staff Report indicates that "Questionnaire respondents reported that TCCSS produced in the United States, Japan, and in non-subject countries are generally interchangeable in most uses. With the exception of some specialty orders for which specifications cannot be met by U.S. producers, the products are relatively close substitutes regarding physical characteristics." Staff Report at II-6. Naturally, dividing non-subject countries into ones that charge high prices with those who charge low prices will likely cause the Commission to find a higher incidence of underselling of the former group than of the latter.[57] As there is no apparent reasonable and consistent basis for grouping the countries as it did, the Commission on remand shall reassess non-subject underselling.

Second, the Commission neglected to compile the pricing data in any meaningful,

---

[57] The court notes that the Commission's statement that subject imports "even undersold lesser-quality non-subject imports" is possibly misleading because, by omitting percentage incidence of underselling, it implies that there was generally underselling of imports from these countries. In fact, there was only one instance of underselling of non-subject imports by Japanese imports, out of a total of 15 comparisons. See Staff Note at Table 4.

consistent way to enable the court to follow its reasoning process. It is insufficient for the Commission simply to cite to all the tables of raw pricing data submitted by the purchasers, and force the court to attempt to reconstruct its analysis. Table II-6 compares quality assessments of purchasers of U.S. product with non-subject product. That U.S. prices were generally superior to non-subject prices, and superior to Japanese prices, says nothing about whether non-subject prices were or were not superior to Japanese prices. Where the Commission has access to data that would enable it to construct a table comparing Japanese prices directly to non-subject prices, in either aggregated or disaggregated form, it should do so (as it now must on remand), rather than leaving the parties and the court to figure out how it arrived at its conclusion.

**Conclusion**

Even though the court finds no error in the Commission's volume analysis, the price effects analysis is unsupported and the causation analysis is flawed in at least two respects. The court expresses no opinion on the result, but the Commission must provide a more complete analysis for whatever decision is reached. Accordingly, the court remands the Commission's Final Determination. With respect to price effects, the Commission on remand shall, in light of the concerns detailed herein: (1) reconsider underselling taking into account inconsistencies in the manner in which the data were presented; (2) explain its methodology for making price comparisons for underselling; (3) indicate the basis for calculating the yearly average margin of underselling and for concluding that such margins are significant; (4) reassess its conclusions with respect to a correlation between subject import competition and domestic prices; (5) reevaluate its price sensitivity finding in light of evidence in the record; and (6) indicate the data and context upon which it bases its findings regarding lost sales. The Commission shall also reassess causation taking into consideration the role of non-price factors in purchasing decisions and non-subject imports.

_____

Jane A. Restani

Judge

DATED:  New York, New York

This 31st  day of December, 2001