**Slip Opinion 02-86**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
NIPPON STEEL CORPORATION,                        :
NKK CORPORATION,                                 :
KAWASAKI STEEL CORPORATION                       :
        and                               :
TOYO KOHAN CO., LTD.,                             :
                               :
        Plaintiffs,                            :
                               :
        v.                                     :        Court No. 00-09-00479
                               :
UNITED STATES,                                   :        **Public Version**
                               :
        Defendant,                             :
                               :
WEIRTON STEEL CORPORATION,                       :
                               :
        Defendant-Intervenor.                  :
_____:

[ITC injury determination vacated.]

Dated: August 9, 2002

Willkie Farr & Gallagher (William H. Barringer; James P. Durling; Daniel L. Porter; Sean M. Thornton; Karl von Shriltz) for plaintiffs.

Lyn M. Schlitt, Office of General Counsel, James M. Lyons, Deputy General Counsel, U.S. International Trade Commission (Laurent M. deWinter), for defendant.

Schagrin Associates (Roger B. Schagrin), for defendant-intervenor.

**OPINION**

**RESTANI, Judge:**

     This matter comes before the court as a result of the court's decision in Nippon Steel Corp. v. United States, 182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) ("Nippon I"), in which the final affirmative injury determination of the International Trade Commission (the

"Commission") in <u>Tin- and Chromium-Coated Steel Sheet From Japan</u>, 65 Fed. Reg. 50005,

USITC Pub. 3300, Inv. No. 731-TA-860 (final determ.) (Aug. 2000) (hereinafter "Final

Determination") was remanded.  Although the court found the Commission's subsidiary

conclusions with respect to subject import volume supported, at least minimally, by substantial

evidence, the court ordered the Commission to reevaluate its analysis of the effect of subject

imports on domestic pricing, as well as its conclusions with respect to causation.  Nippon Steel

Corporation, NKK Corporation, Kawasaki Steel Corporation, and Toyo Kohan Co., Ltd.,

(collectively "Nippon" or "Plaintiffs"), respondents in the underlying investigation, contest the

Commission's March 4, 2002 affirmative injury determination pursuant to remand

("Redetermination") on the grounds that the Commission's analysis of price effects and

causation remain unsupported by substantial evidence.[1]

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  The court will uphold

the Commission's determination in an antidumping investigation unless it is "unsupported by

substantial evidence in the administrative record or is otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).

---

[1]In its original challenge to the Commissioners' affirmative determination, Plaintiffs claimed both a lack of substantial evidence for the ITC's determination and prejudicial Congressional interference.  The court found insufficient evidence to support the latter challenge. Although the court's finding that ITC had no substantial evidence for its decision may be relevant to Plaintiffs' claim of undue Congressional influence, there is no purpose to revisiting that issue because the case is fully disposed on the alternative ground.

**OVERVIEW**

The crucial question of price effects and ultimate causation of material injury arise in the context of an industry with peculiar conditions of competition. Chairman Koplan in dissent succinctly summarized these conditions, which cannot be seriously disputed by the parties or the Commission majority. He stated as follows:

> The following conditions of competition unique to the U.S. tin plate industry, which were identified in the preliminary determination, are central to my analysis: (1) tin plate is almost always sold in the United States pursuant to annual contracts that establish fixed prices and target volumes; (2) reliable delivery is extremely important to the purchasers – the domestic can making [industry] – because food must be canned as soon as possible after it reaches the canning facility;[2] (3) the purchasers have consolidated and are now highly concentrated (the six largest purchasers account for more than three-quarters of apparent domestic consumption); (4) several of the major purchasers operate canning facilities on the grounds of Weirton's mill and commit to buy a minimum volume of steel from Weirton;[3] (5) non-subject imports entered the U.S. market in a larger volume than subject imports from Japan during the period of investigation (POI) and non-subject imports occupied a greater market share than did imports from Japan; (6) most domestic producers, including petitioner Weirton, are located either on the East Coast or in the Midwest and focus their sales in regions near their mills; and (7) demand in the canning industry is affected by the harvest of agricultural goods used for canned foods.[4]

Tin- and Chromium-Coated Steel Sheet From Japan, 65 Fed. Reg. 50005, USITC Pub. 3300, Inv. No. 731-TA-860 (final determ.) (Koplan, S., dissenting) (Aug. 2000) (footnotes added). The court also notes that the U.S. producers are largely long established integrated steel producers. A new domestic producer of tin-milled products, which is said to have a cost advantage, was present during the POI.

---

[2] There are contractually set performance times the can producers must meet. The other dissenting commissioner noted that there are some minor non-food uses.

[3] Weirton Steel Corporation has the largest tin mill in the United States.

[4] Lack of demand was not cited as a reason for harm.

Both dissenters found evidence of no price effects due to subject imports, based on the manner of price negotiation and setting, and the seemingly incontrovertible evidence that domestic reliability problems were a tremendous concern to the purchasers. The majority cites no evidence that can sustain its opposite conclusion.

Further, upon review of the Redetermination, the court finds that the Commission has failed to comply with the court's instructions in Nippon I, and either conceded, or failed to contest evidence that leads inexorably to a finding that subject imports have not caused material harm to the domestic industry.

The Commission failed to follow the court's instructions on selection and compilation of data. First, it maintained a particular purchaser's separate facilities and product types in disaggregated form. Second, the Commission ignored the court's directive to justify limiting the range of price comparisons to only those instances in which sales were ultimately made from both Japanese and U.S. suppliers. Lastly, at times it relied solely on underselling data for one year.

In its analysis of underselling, the Commission ignored explanatory information provided by large purchasers where: (1) Silgan cited quality and service as being its two most important purchasing priorities and explained that unique manufacturing capabilities led to its decision to purchase from some off-shore sources; (2) Crown stated that it based its purchases of Japanese imports on quality considerations; and (3) the Commission failed to determine the extent to which purchasers' measurements of determinative price differentials are borne out by the purchasing histories of these purchasers.

Furthermore, in regard to the correlation between subject imports and pricing, the

Commission: (1) failed to address Nippon's contention that a large purchaser – [        ] – paid increasing domestic prices at the same time it increased its purchases of subject imports; (2) failed to address the correlation between the introduction of subject import by another purchaser [        ] in 1999 and the subsequent rise in domestic prices between 1999 and 2000; (3) addressed another purchaser's [        ] ability to secure price decreases from its domestic suppliers, yet conceded that non-subject import volume largely accounted for the price decline; and (4) failed to address the lack of correlation between Silgan's purchases of subject imports and pricing, where Nippon specifically cited Silgan as evidence of a lack of correlation. Lastly, the Commission failed to assess the extent of the domestic lead-time price premium in relation to the underselling margin.

The Commission failed to take into account relevant market factors in determining price sensitivity. First, it conceded that factors such as quality and service are generally ranked higher than price by purchasers, yet concluded that the market is characterized by a high degree of price sensitivity. Furthermore, the Commission asserted that quality and reliability are important only for the purpose of qualifying suppliers, yet failed to rebut the assertion that purchasers ranked price as a low consideration in choosing among *qualified* purchasers.

The Commission failed to adequately address Nippon's contention that negotiations run on separate tracks according to different procedures and criteria. In its analysis, the Commission: (1) failed to support its conclusion that purchasers reallocate volume following the conclusion of price negotiations; (2) conceded that the existence of supply agreements cuts against the finding that competition from subject imports impacted domestic prices; (3) conceded that delivery time issues operate to limit the absolute amount of the domestic market that imports could obtain, yet

failed to evaluate purchaser perceptions with respect to the domestic industry's lead-time advantage as an explanation for keeping negotiations on separate tracks with volume allocated among domestic versus foreign producers; and (4) conceded that Weirton was unable to submit any documents indicating that it set its prices with reference to foreign importers, and provided insubstantial justification for Weirton's failure to give such support.

In its lost sale analysis, the Commission relied on a lost sale allegation, where it ignored evidence on the record undermining the likelihood that a significant sale was lost for price reasons. Also, the Commission inadequately responded to the court's concerns regarding whether on-time performance and quality concerns were the predominant cause of harm to the domestic TCCSS industry. The Commission: (1) failed to cite the sources of its individual purchaser volume data throughout its analysis; (2) appeared to use numbers from Table TCCSS-1, for its analysis of purchaser BWAY, while for the remaining purchasers it inexplicably appeared to use figures from tables in the Staff Report that conflict with Table TCCSS-1; (3) supported its position with "trends" over two year periods of time, which ignore that the full set of data indicates that there had been no clear trend at all; and (4) never accounted for the year 2000, and at times limited its analysis to the change from 1998 to 1999.

The Commission inadequately responded to the court's concerns regarding whether non-subject imports were the predominant cause of harm to the domestic TCCSS industry. It apparently conceded that non-subject import volume prevails over subject imports industry wide, and failed to provide sufficient evidence that there is a correlation between subject import volume and harm to the domestic industry on the West Coast where subject imports are concentrated. Further, by comparing bids over two year periods, the Commission created trends

for pricing in the marketplace, where again no actual trends exist.

As the following discussion demonstrates, with relatively low subject import volume and market share, no substantial evidence of adverse price effects caused by subject imports and no valid links establishing causation of material injury, this case compels the conclusion that this record will support only a negative determination.

## DISCUSSION

With respect to the effect of subject imports on domestic pricing, the court in Nippon I generally ordered the Commission on remand to: (1) reconsider its underselling findings taking into account inconsistencies in the manner in which the data were presented; (2) explain its methodology for making price comparisons for underselling; (3) indicate the basis for calculating the yearly average margin of underselling and for concluding that such margins are significant; (4) reassess its conclusions with respect to a correlation between subject import competition and domestic prices; (5) reevaluate its price sensitivity finding in light of evidence in the record; and (6) indicate the data and context upon which it bases its findings regarding lost sales. In addition, the court ordered the Commission to reassess causation taking into consideration the role of non-price factors in purchasing decisions as well as that of non-subject imports.

## I. Effect of Subject Imports on Domestic Prices

Nippon claims that the Commission failed to comply with the court's following directives: (1) to present data on customer purchase prices "in a way that will facilitate review of pricing/volume trends" and "in a reasonably consistent manner with respect to purchaser and

product grouping"; and (2) to "indicate the basis for its . . . underselling analysis," and why

underselling margins in 1999 were significant.[5] Nippon I 182 F. Supp. 2d at 1356.

**A. Methodology for Making Price Comparisons**

In the Preliminary Determination, the Commission analyzed underselling by comparing

weighted average f.o.b. prices and quantities for U.S. producers with those for Japanese

producers. See Preliminary Determination at V-6. In the Final Determination, however, the

Commission based its underselling findings on data that included separate bidding information

for a particular purchaser's[6] three different tin-mill products purchased at each of its three

facilities, while other large purchasers submitted a unified pricing chart detailing a single bid

price for each supplier. See Final Determination at 15-16. Nippon argued that data for this

purchaser was consequently "over-represented" on account of the Commission's methodology of

counting "instances" of underselling without regard to the actual volumes purchased.

The court in Nippon I ordered the Commission to "present the data in a reasonably

consistent manner with respect to purchaser and product grouping, as well as the expression of

prices bid and paid." 182 F. Supp. 2d at 1343. Nippon claims that the Commission has not

complied with the court's directive by continuing to "rely on the number of instances of

underselling without first taking into account how the underlying data is grouped." Id. at 1342.

---

[5] Nippon does not contest the Commission's explanation of its reliance on bidding data submitted by purchasers.

[6] This purchaser is [        ].

1.  Standardization of Pricing Data

With respect to the "expression of prices bid and paid," the court expressed

dissatisfaction with the Commission's unexplained division of data into two separate groups, i.e.,

according to those purchasers who reported prices in dollar amounts and those who reported

prices in terms of the discount rate from an industry list price.  See Nippon I, 182 F. Supp. 2d at

1340 n.18.  First, the Commission had not indicated the yearly list prices to which the discount

rates were applied, thereby precluding the court from converting the discount rates into dollar

prices, or vice versa, assuming it was inclined to do so.  Simply presenting year-to-year discount

rates without taking into consideration the list price may be misleading inasmuch as an increase

in the list price may outstrip an increase in the discount rate.   Second,  the Commission's use of

bifurcated data hinders review of the Commission's determinations with respect to pricing trends

across the *entire* market.

On remand, the Commission stated that "[b]ecause of the different manners in which

purchasers reported data, and differences in product mix between purchasers, we find that

calculating a single rate across all purchasers would not be appropriate."  Redetermination at 10.

Nippon does not contest the Commission's explanation for its decision not to convert discount

rates into prices, or vice versa.

2. Selection and Compilation of Price Comparison Data

With respect to purchaser and product grouping, the court in Nippon I found that the

Commission failed to explain why it based its underselling calculations "solely on the number of

individual bids from purchasers that purchased from both Japanese and domestic suppliers in a

particular year, irrespective of volume," or "why it chose to reject the quarterly weighted average

price calculations made in the Preliminary Determination." 182 F. Supp. 2d at 1341. The court

specified that "where the Commission chooses to limit its underselling analysis to a subset of the

pricing data available, the Commission must indicate the criteria it used for making the price

comparisons." Id.

The court also ordered the Commission on remand to "account for differences in the way

that data is reported in order to ensure that its calculations are accurate." Id. The court reasoned

that "the Commission cannot ignore the manner in which the data is presented, and the

Commission cannot rely on the number of instances of underselling without first taking into

account how the underlying data is grouped." Id. Specifically, the court indicated that the

Commission failed to explain why a particular purchaser's three facilities were counted

separately, or why for this particular purchaser it counted separately each type of product

purchased by an individual canning company, other than stating that the purchaser had reported

its data in this manner. Id.

On remand, the Commission recompiled the data on price comparisons. The

Commission created a new table counting Japanese bids below, within the range of, and above

domestic bids, with the corresponding subject import volume. The Commission provided

separate bidding data for the purchaser that had reported data for each of its three facilities as

well as for three different varieties of TCCSS – [        ].

The Commission explained that it continued to separate out the particular purchaser's

data from the rest of the purchasers for two reasons: (1) "[b]ecause the company's data were

based on average unit values ("AUVs"), rather than discount rates, consolidation of the firm's

data into single annual price figures posed the risk of masking price differences based on product

mix or geographical considerations"; and (2) the purchaser "reported data on the basis of a May-April fiscal year that straddles individual calendar years and does not conform to the calendar-year basis on which other purchasers reported data." Redetermination at 9.

Nippon claims that by segregating data for one purchaser and indicating corresponding volume, the Commission "does not place underselling in context," and that "the Commission's emphasis on the increased volume of underbid subject imports in 1999 for purchasers other than [the segregated purchaser] and in 1999/2000 for [the same purchaser] is directly contradicted by the lack of correlation between subject import purchasers and domestic price suppression or depression for numerous individual purchasers." Pl. Br. at 2.

The court finds that the Commission's decision to keep in disaggregated form the particular purchaser's separate facilities and product types is not adequately explained or cannot be explained. Further, the court finds that the Commission has not addressed the court's principal concern – as stated in the opinion and during the summary judgment hearing – that the decision to narrow the pool of comparisons to only those instances in which sales were ultimately made from both Japanese and U.S. suppliers is seemingly unprecedented and might give skewed results. For example, by not considering instances in which bids were received from both U.S. and Japanese producers, yet purchases ultimately were made only from suppliers from one of the countries, the Commission does not assess sales actually lost. The use of such a narrow data sample also renders a misleading picture of underselling frequency, as the number of total comparisons is artificially lowered. Because the Commission ignored the court's directive to justify limiting the range of price comparisons in the manner it did, or indicate any prior application of such a limitation, the court determines that the Commission inappropriately relied

on an apparently skewed picture of the extent of underselling.

Furthermore, the Commission's analysis relies solely on underselling data for one year, apparently discounting the importance of its acknowledgment that there was no underselling of any significance in 1997 or 1998. Having dispensed with the use of a trend analysis of underselling data, the Commission may not rely, as it has done in this case, on trends in subject import market share and domestic pricing to substantiate the significance of its one-year data on underselling. The court therefore finds that the Commission has not complied with its instructions to indicate the criteria for its decision to limit its underselling analysis to particular data and to explain the selection and compilation of data on underselling. Without this information, the Commission's analysis cannot be supported by substantial evidence because there is no logical connection between the facts found and the choice made. See Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).

**B. Underselling Analysis**

In Nippon I, the court ordered the Commission to explain why the margin of underselling was significant, considering in particular the purchaser questionnaire responses regarding the price differential likely to induce a switch of suppliers. The court also ordered the Commission to explain whether any of the underselling reflected premiums paid to domestic producers for superior lead times.

**1. Margin of Underselling**

In the Final Determination, the Commission calculated an underselling margin of 2.156 percent, and found that a there was "a significant increase in the magnitude of the underselling," where "[i]n 1997 Japanese bids were generally not underselling domestic bids. In 1998, Japanese

bids undersold domestic bids by 0.70 percent on average and by 1999, when subject import volume was greatest, the magnitude of underselling had risen to 5.77 percent on average." Final Determination at 16.

In Nippon I, the court found that the Commission had not met its burden of establishing why, assuming the margins actually exist, the margins are significant because (1) the Commission cited a non-existent table;[7] (2) the rate of increase in the margin was of limited probative value in the absence of any analysis of the range of price differentials that purchasers indicated would induce them to switch suppliers; and (3) the Commission did not analyze whether the domestic producers' undisputed lead-time advantage accounted for the margin of underselling.

On remand, the Commission found that "Japanese bids were often within the range of or higher than U.S. bids in 1997 and 1998, but were generally lower than U.S. bids in 1999," and that "[t]he instances of lower Japanese bids in 1999 represent higher volumes of subject imports than in previous years." Redetermination at 9.[8] Having dispensed with relying on an average margin, the Commission on remand focused on the margins of underselling for several larger purchasers in 1999, the only year in which it found generally lower Japanese prices.[9] From the

---

[7] On remand, the Commission indicated that the mis-cited table was in fact "Table 1 – Requested by Commissioner Hillman for INV. No. 731-TA-860 (final) Tin- and Chromium-coated Steel from Japan," which consolidated pricing data from the Staff Report.

[8] As indicated, the Commission found that "calculating a single rate across all purchasers would not be appropriate" due to "differences in product mix between purchasers" and therefore analyzes underselling data for individual purchasers. Nippon does not contest the Commission's decision to analyze underselling data on an individual purchaser basis.

[9] The Commission indicated that these margins in 1999 were as follows: [          ]. See Redetermination at 11; Purchaser Questionnaire, IV-8.

purchaser responses', the Commission derived an overall range – two to six percent – of a price differential that would induce a switch of suppliers for 1999,[10] and concluded that the underselling margins are "generally near or at the ranges found by responding purchasers to be significant . . . ." Redetermination at 12-13.

Nippon argues that the Commission's reliance on an aggregate range of price differentials and underselling margins masks that four of the six major purchasers indicated in their questionnaire responses and elsewhere that the actual underselling margins were not significant to their purchasing decisions. Nippon further argues that for one of the remaining two purchasers – [          ] – the reported price differential is not borne out by its actual purchasing history. Thus, Nippon concludes that only one major purchaser's – [        ] – underselling margin fell within its reported price differential.

The court determines that the Commission has ignored explanatory information provided by large purchasers that give context to their responses' determinant price differential. First, [      ] did not give a price differential, instead referring the Commission to its response to Question IV-7, in which it described its purchasing criteria as follows:

> We choose steel suppliers based on 1) quality, 2) service and 3) price, in that order of importance. As a result of longer lead times (part of service) we purchase significantly less material from non-domestic producers than from U.S. sources. . . . [U]nique manufacturing capabilities of some off-shore sources drive us to purchase from them irrespective of their prices which, in most cases, are higher than U.S. producer prices.

[      ] Questionnaire Response at Question IV-7. Second, [      ] specified in its response that it "did not select the Japanese based on price, but on quality performance." [      ] Questionnaire

---

[10] The Commission noted purchaser responses as follows: [             ]. See Redetermination at 12 n. 34.

Response at Question IV-8. Third, the margin of underselling cited by the Commission, Redetermination at 8, for [        ] in 1999 is not the margin found in Table V-16, [        ], below the stated determinant price differential. Rather than address these inconsistencies, the Commission merely reiterates its aggregate range figures and states that they were "generally near or at the ranges reported by purchasers to be significant . . ." ITC Br. at 3. The Commission cannot ignore purchaser comments that would give meaning to their estimates of the price differential that would induce a switch of suppliers. The Commission has also failed to determine the extent to which purchaser measurements of determinative price differentials are actually borne out by the purchasing history of these particular purchasers.[11]

The court notes that the form of the question in the Purchaser Questionnaires is a likely source of the apparent disconnect between purchaser responses regarding the slight determinative price differential and their indication that other criteria drove their pricing decisions, as well as their actual purchasing history. The questionnaire asks purchasers how much *higher* Japanese prices would have to be before they switch to a *domestic producer*. Since the Commission is attempting to analyze the extent of underselling, a more relevant question is how much *lower* Japanese prices would have to be before the purchasers would switch to a Japanese producer. Such a question necessarily would take into account purchasers' non-price considerations in making a switch of supplier. Thus, the data relied upon by the Commission in addressing the

---

[11] For example, the Commission fails to address Nippon's contention that [        ], which accounted for the bulk of the instances of underselling calculated by the Commission, represented that a [        ] increase in subject import prices would cause it to switch to domestic suppliers, but domestic purchases by this purchaser actually increased from 1998 to 1999, in spite of an underselling margin that increased from [        ] percent in 1998 to [        ] percent in 1999. See [        ] Questionnaire Response at Question IV-8; Staff Report at V-12-13.

effect of underselling below a certain margin is questionable at best, as are the conclusions drawn therefrom.

## 2. Correlation between Subject Imports and Domestic Prices

The court in Nippon I found that the Commission had ignored "evidence apparently contradicting a finding of a correlation" between subject import purchases and domestic price suppression and depression, holding that "where data is available," and "relied on by respondents, the Commission must address the individual purchaser data in some manner." 182 F. Supp. 2d at 1344. The court reasoned that "[p]ricing trends for a particular large purchaser may indicate the lack of a correlation between the existence of competition with Japanese imports and a decline in prices paid by that particular purchaser," and that where data on general pricing trends were admittedly mixed, the Commission should use available data to determine whether a correlation existed for particular purchasers. Id. The court therefore instructed the Commission to address data that apparently showed that: (1) the largest purchasers of subject imports generally paid increased prices to domestic suppliers and (2) those who purchased no subject imports were able to secure price decreases from their domestic suppliers.

On remand, the Commission reiterated its findings that subject imports generally undersold domestic producers in 1999, and that increased import volume coincided with reduced domestic volume:

> For the largest purchasers, the data indicate that (1) Japanese discount rates were higher in 1999 than the U.S. rates for the same customer; (2) Japanese prices were lower in 1999 than U.S. prices for the same customer; (3) the volumes of bids accepted from Japanese suppliers by every purchaser increased from 1997 to 1999; and (4) the volumes of bids accepted from domestic suppliers by every purchaser

except Silgan decreased in 1999 compared to the volumes of bids accepted over prior periods.

Redetermination at 25.[12]

In accordance with the court's instructions, the Commission also reexamined the individual purchaser data cited by respondents as undercutting its correlation finding. The Commission first discounted the importance of evidence that a particular purchaser – [    ] paid prices apparently higher than its competitors did, notwithstanding the fact that the bulk of its purchases were from Japan. The Commission reasoned that comparing the average annual price among purchasers is likely to be of limited probative value due to the variations in product specifications among them.

Nippon asserts that the Commission's explanation ignores the court's instructions. The

---

[12] The court in Nippon I did not find error in the Commission's findings regarding general pricing and volume trends per se, and instead evaluated the extent to which the Commission addressed Nippon's contentions regarding the lack of correlation. Nippon now alleges that the Commission's finding of a general decline in subject import pricing is contradicted by evidence that [    ] accepted Japanese bids that were higher than certain accepted bids in 1999. Nippon inappropriately focuses on isolated bits of data that on the whole do not necessarily undermine the Commission's conclusions regarding overall trends.

Nippon also disputes the Commission's finding that "the volumes of bids accepted from Japanese suppliers by every purchaser increased from 1997 to 1999," on the ground that one purchaser – [    ] purchased subject imports for the first time in 1999, another – [    ] – increased its purchase of subject imports by only insignificant amounts, and another – [    ] decreased subject import purchases between 1998 and 1999. Nippon also alleges that the Commission's finding that "the volumes of bids accepted from domestic suppliers by every purchaser except Silgan decreased in 1999 compared to volumes of bids accepted over prior periods" is false. Nippon contends that two purchasers – [    ] increased domestic purchases, while another – [    ] – had reduced domestic purchases by a slight amount from 1997 to 1998, and increased domestic purchases from 1998 to 2000. The court in Nippon I, however, sustained the Commission's finding of low but significant subject import volume as an isolated finding and does not revisit the issue, except as it affects the ultimate causation conclusion. See Nippon I, 182 F. Supp. 2d at 1335-40.

court agrees that, by focusing only on comparative pricing, the Commission ignored its

instructions to address Nippon's contention that "the largest purchasers of subject imports

generally paid increased prices to domestic suppliers."  Although the court noted an apparent

inconsistency in pricing trends for this purchaser in comparison to other purchasers, it is clear

that the court did not restrict the Commission's analysis to comparative pricing across the

industry.  Thus, the Commission fails to address the contention that a large purchaser – [        ] –

paid increasing domestic prices at the same time it increased its purchases of subject imports

between 1997 and 1999.  As this particular purchaser accounts for the bulk of the instances of

underselling that the Commission determined to be significant, the individual purchasing history

is of critical importance.

The Commission did address, however, the case of a particular purchaser – [      ] –  who

was able to secure price decreases from its domestic suppliers notwithstanding the lack of any

purchases from Japan until 1999.  The Commission noted that the purchaser's bid range of the

discount rate did in fact increase over the POI, but attributed the price decline to (1) the

purchaser's inability to settle at prices "substantially at odds" with its competition; (2) its

purchase of substantial volumes of non-subject imports.  The Commission found, however, that

this purchaser's experience "indicates that non-subject imports also impacted domestic prices,

but is in no way inconsistent with the conclusion, based on the experience of other purchasers,

that subject imports had a significant impact as well."  Redetermination at 26.  Having found that

a particular purchaser's non-subject imports volume largely accounted for the price decline, the

Commission attempts to circumvent the implications of its concession by stating that it was "not

inconsistent" with a finding that subject imports also had an impact based on the experience of

other purchasers. The use of circumlocution and vaguely referencing other purchasers' experiences hardly constitutes supporting its individual purchaser determinations with substantial evidence.

The Commission also analyzed whether another purchaser – [      ] – increased its prices to domestic suppliers in 1999 despite the introduction of lower-priced bids from Japanese suppliers. The Commission found that "the data . . . do not indicate that . . . prices paid to domestic producers actually increased in 1999," as the prices were [            ] Although prices paid by this purchaser were stable from 1998-1999, the Commission omits that after the introduction of lower-priced subject import purchases in 1999, prices increased for all domestic producers over the period 1999 to 2000, the time period which the court was clearly instructing the Commission to address. Thus, in the absence of any explanation of why this lack of correlation is somehow insignificant, the court rejects the Commission's treatment of this third producer's data.

Lastly, the Commission did not address data from Silgan on the grounds that the court only drew its attention to three other purchasers, namely [            ]. The Commission omits that the court specifically instructed it to address individual purchaser data where such data is available and "relied on by respondents." The Commission does not dispute that the respondents specifically cited the case of Silgan as evidence of a lack of correlation.

In sum, the court finds that the Commission's treatment of individual pricing data does not comply with the court's instructions and certainly does not constitute a serious analysis of large purchaser's pricing data trends that at least facially invalidates its overall correlation determination.

### 3. Domestic Producers' Price Premium due to Lead-Time Advantage

The court in Nippon I found that the Commission failed to analyze "whether the undisputed lead-time advantage held by the domestic industry in fact translated into an ability to maintain a price premium over imports, which may or may not account for the margin of underselling." 182 F. Supp. 2d at 1342. On remand, the Commission concedes that domestic producers did enjoy a lead time advantage over their Japanese competitors, and acknowledged that quicker product delivery translates into an ability to exact a price premium due to the benefit to purchasers in being able to modify purchase orders on shorter notice. Redetermination at 13. Nevertheless, the Commission found that this phenomenon was diminished by: (1) the existence of supply contracts that allow suppliers to know several quarters ahead of time how much TCCSS they are required to deliver to their customers, as evidenced by purchaser testimony regarding the superior on-time delivery of Japanese importers; and (2) purchasers' uniform assessment that Japanese TCCSS is superior in quality to domestic TCCSS.

The Commission's explanation is inconsistent with its findings regarding price sensitivity and alternative causation. The Commission found that superior on-time delivery and quality were not to such an extent as to account for purchasers' decision to switch to Japanese suppliers, see section C.1, infra, but were somehow of such an extent to minimize the price premium attributable to the domestic lead-time advantage. Even if the conceded price premium due to an acknowledged lead-time advantage were somewhat diminished, the price premium may still eclipse the underselling margin. The Commission failed to assess the extent of the price premium in relation to the underselling margin.

## C. Conditions of Competition relating to Price Effects

### 1. Price Sensitivity

In the Final Determination, the Commission found that the TCCSS market is characterized by a high degree of price sensitivity, notwithstanding evidence that "lowest price" was ranked by purchasers seventh of approximately ten factors in terms of importance in decision-making. The court in Nippon I found that the Commission's price sensitivity finding was not supported by substantial evidence where it rested solely on evidence of market concentration (in terms of both supply and demand) and on the price specificity used in negotiations. 182 F. Supp. 2d at 1345-48. The court also held that "if the Commission chooses to rely on price sensitivity . . . it must assess other aspects of the TCCSS industry that would tend to reduce, if not entirely vitiate, the importance of price in purchaser decision-making," such as on-time delivery or product quality, or at least evaluate the responses regarding the price differential sufficient to induce a switch of suppliers. Id. at 1346.

On remand, having discounted the effect of domestic lead-time advantage, the Commission averred that the "high degree of price sensitivity" substantiates the significance of underselling. The Commission acknowledged that purchasers generally ranked "lowest price" as less important than other considerations in questionnaire responses. Nevertheless, the Commission concluded that because bids are only solicited from qualified suppliers[13] "purchasing decisions are *sometimes, or even usually*, based *mainly* on price." Id. at 14-15 (emphasis added). The Commission further indicated that once a supplier is qualified, "the

---

[13] The Commission defines qualified suppliers as those suppliers that have proven that they can deliver the desired quality and quantity in a steady and reliable manner. Redetermination at 15.

quality and reliability of that supplier's product have already been established, leaving price and volume the primary remaining factors to be negotiated." Id. at 15 n.47.

The Commission then restated its previous findings from the Final Determination regarding price specificity, i.e., that "[p]urchaser documents indicate that very modest changes in the discount rate could mean the difference between winning or losing contracts," and that "[p]rice is negotiated intensely in annual contract negotiations, often down to the hundredths of one percent." Id. at 15-16.[14]   Lastly, the Commission indicated that the fact that purchasers entered into buying alliances to improve their negotiating position "emphasize[s] the central role of obtaining lower prices to the purchasers of TCCSS," although the Commission determined that such developments ultimately had a limited impact on prices during the POI.  Id. at 16-17.[15]

Nippon argues that the Commission's finding that once a supplier is qualified, quality and reliability are no longer important considerations is unsupported by substantial evidence where questionnaire responses demonstrate that purchasers emphasize quality and reliability when choosing among qualified suppliers.  The record shows that non-price factors are in fact major determinants in purchasers' decision-making, even after suppliers are deemed "qualified." See

---

[14] The Commission relied upon a questionnaire response and an internal document of two particular purchasers, one of which involved a price difference of [    ] and the other [    ].

[15] Although the court found that the Commission's decision to discount purchaser consolidation, in isolation, was not error, there is no doubt that the opposite conclusion reached by the dissents is supported.  This factor has implication for the ultimate causation decision.  The Commission must assess the strength of its subsidiary findings in arriving at its final determination.

Staff Report at II-11 to 12.[16] Questions III-18 and IV-11 of the purchaser questionnaires clearly ask purchasers to rank the importance of "lowest price" and other considerations in choosing among qualified suppliers only. Neither the Commission nor the Defendant-Intervenors attempt to rebut this fact. Rather, they merely reiterate that the Commission acknowledged the importance of other factors such as quality, sidestepping the court's admonition in Nippon I that simply noting the importance of other factors does not constitute analysis sufficient to support its conclusion. 182 F. Supp. 2d at 1346. Furthermore, the insertion of qualifying phrases such as "sometimes or even usually" and "mainly on price" only serve to undercut the Commission's overall determination that the market is characterized by a "high degree" of price sensitivity.

Although the Commission in all cases need not make specific findings with respect to price sensitivity, this condition of competition is of particular importance when the margin of underselling is slight, debatable or not markedly or universally greater than the amount of a price differential determinative of purchasing decisions, and even more so when evidence credibly indicates that non-price factors outrank the importance of price in purchaser decision-making. As the Commission has not met its burden of assessing purchaser decision making in the context of relevant market factors, the court finds the Commission's conclusion of price sensitivity unsupported by substantial evidence.

### 2. Negotiating Practices

In the Final Determination, the Commission found that the record reflected aggressive

_____

[16]The court notes the Commission's normal skepticism as to the purchasers' ranking of price considerations, but here such generalized skepticism is unwarranted. On-time reliable performance was particularly important in the TCCSS market and the Commission cannot ignore this fact in assessing purchasing decision-making.

pricing of subject imports "has been used by at least some purchasers in their price negotiations with the domestic suppliers." Final Determination at 16. The court in Nippon I held that the Commission's analysis of contract negotiating practices was unsupported by substantial evidence because the Commission inappropriately rejected four large purchasers' entire testimony, and had inadequately considered evidence "support[ing] the purchaser's contention and fundamental point that negotiations run on separate tracks according to different procedures and criteria." 182 F. Supp. 2d at 1346-47. The court explained that: (a) the overlap of time in negotiation was not inconsistent with supply compartmentalization; (b) the Commission failed to adequately consider supply agreements that limit price competition to domestic suppliers; (c) the Commission did not adequately analyze the significance of long import lead times; and (d) the Commission failed to address Weirton's submission of contemporaneous pricing documents citing domestic competition, but not import competition, when it should have been motivated to submit such documentation if it existed.

### a. Contemporaneity versus Compartmentalization

On remand, the Commission reiterated its findings that negotiations did not take place consecutively, and that there was a substantial overlap in time periods for negotiating. See Redetermination at 17. By emphasizing in Nippon I that the time overlap was of little consequence in light of Nippon's fundamental claim that negotiations were compartmentalized, the court drew the Commission's attention to evidence that a large TCCSS purchaser delayed concluding negotiations with foreign producers until it had secured a certain level of volume from domestic producers, and that foreign prices aren't established until negotiations with domestic mills are concluded. See 182 F. Supp. 2d at 1347 n.32. The Commission did not

address the extent to which such a division of major and minor tonnage and bifurcation of price

negotiation was representative of TCCSS purchasers' practices. Rather, the Commission stated

that the evidence suggests that "under the contract terms, while prices may be set, volumes are

not; therefore, even after negotiations with domestic suppliers are concluded, purchasers can

reallocate volume to non-domestic suppliers during the year (without breaking the contract)

based on lower prices of imports," and that "[d]omestic producers testified that, even if a

purchaser breached a contract, they were not likely to sue on and terminate the contract."

Although the Commission theorizes that volume can be reallocated based on lower prices of

imports, the Commission fails to cite any evidence as to whether such reallocation in fact

occurred. The mere possibility that subject import pricing could induce a purchaser to reallocate

volume even after prices have been set does not speak to the issue of whether prices are set

wholly independently at the outset. The issue here is likely price effects.

### b . Supply Agreements

On remand, the Commission determined that supply agreements were not a large factor in

the market, where it found only two supply agreements limiting price competition to domestic

producers, both of which pre-date the increase in subject imports, and would not have prevented

purchasers from using "the possibility of additional purchases of foreign product to improve their

negotiating position with domestic suppliers." Redetermination at 23-24.

Nippon alleges that the Commission ignored supply agreements on the record,[17] and that

the Commission's findings do not detract from the clear evidence that agreements limiting price

---

[17] Specifically, Nippon alleges that the Commission did not address supply agreements between [                    ] on the record.

competition to domestic suppliers are prevalent in the TCCSS industry.  Nippon further argues

that the prevalence of such agreements is consistent with Weirton's practice of calculating its

"pricing allowance range solely according to pricing data of domestic producers," as the court

noted in Nippon I, 182 F. Supp. 2d at 1348.

The Commission does not address Nippon's arguments relating to the prevalence and

impact of supply agreements, and merely states that it acknowledged that the existence of supply

agreements "cut against a finding that competition from subject imports impacted domestic

prices."  ITC Br. at 10.  Thus, the court finds that the Commission has conceded this point.

### c. Lead Times

The court instructed the Commission to analyze "whether the acknowledged difference in

lead times cause purchasers to consider foreign supply 'supplementary,' and allocate

predetermined volumes to foreign and domestic supply sources."  Nippon I, 182 F. Supp. 2d at

1347.  On remand, the Commission stated that "the ability of purchasers to use lower foreign

prices to obtain more favorable domestic prices could be limited if it were generally understood

that foreign product, because of longer lead times, could only occupy a small residual or

supplementary portion of the domestic market."  Redetermination at 20.  The Commission

conceded that "delivery time issues do operate to limit the absolute amount of the domestic

market that imports could realistically hope to obtain."  Id.  The Commission found, however,

that "[t]he substantial share of the market acquired by imports . . . rebuts the notion that imports

can only occupy a niche position in the U.S. TCCSS market and are therefore inherently

incapable of impacting the overall pricing environment."  Id. at 21.  The Commission reasons

that  "in an industry with relatively few players each possessing very good market knowledge,"

domestic producers would have felt compelled to offer lower prices to defend their market share against "rapidly rising import volumes." Id. at 22.

Nippon contends that market knowledge is in fact limited among TCCSS market participants, as evidenced by data for two purchasers accounting for a substantial percentage – [

] – of the increase in subject imports over the POI that [

].

The court finds that the Commission has mischaracterized the court's instructions, creating a straw-man argument that is easily refuted. The court did not order the Commission to determine whether subject imports could only capture a limited percentage of the market. Rather, the court instructed the Commission to evaluate purchaser perceptions with respect to the domestic industry's lead-time advantage as a potential explanation for keeping negotiations on separate tracks with volume allocated among domestic versus foreign producers. Naturally, the Commission in conducting this analysis would need to evaluate whether such a condition of competition, if it in fact existed, would have an effect on the ability of subject imports to have an effect on domestic prices. The Commission has avoided addressing this issue. Furthermore, the Commission reliance on the acceleration of subject import volume is misplaced, as the rate of increase of subject imports says nothing about allocation of volume based on risks involved in a substantial lead-time differential.[18]

### d. Weirton Documentation regarding Price Competition

---

[18] In Nippon I, the court drew the Commission's attention to the Staff Report's indication that most U.S. producers were reported as being capable of delivery within 6 to 8 weeks, while most importers had lead times in the 3 to 4.5 month range. See Staff Report at II-13.

On remand, the Commission conceded that Weirton was unable to submit any contemporaneous documents citing import price competition, and that the lack of such documents supports the view that import and domestic contract negotiations are compartmentalized.  Nevertheless, the Commission assigned little weight to the absence of such documents, in light of the fact that "purchasers failed to provide any documentation regarding their contract negotiations with importers of Japanese product . . . ."  Redetermination at 22.

Nippon claims that purchasers did in fact submit documentation regarding contract negotiations with importers of Japanese product.   Nippon Br. at 10 (citing Redetermination at 17 n.51).  Nippon further argues that the Commission's reliance on the purported lack of such evidence is a red herring inasmuch as it does not detract from the fact that  "Weirton had every incentive to submit documentary evidence of subject import competition, but could only submit documents demonstrating that its prices were calculated with reference to only domestic competitors."  Id.

As with supply agreements, the Commission concedes that the lack of Weirton documents regarding Japanese pricing undermines a finding that subject imports had an adverse impact on domestic pricing.  Nevertheless, the Commission responds that, although Nippon indicated that some evidence regarding purchaser's negotiations with foreign suppliers was in fact in the record, Nippon omits that none of the evidence substantiates its claim that subject foreign producers set their prices solely in reaction to prices previously agreed by domestic producers.

The court finds that the Commission's justification for assigning little weight to the lack of documentation regarding import price competition is unpersuasive.  The court in Nippon I

underscored the importance of Weirton's supporting documentation, as the only pricing documents submitted by Weirton apparently showed that its pricing range was determined without regard to foreign prices. 182 F. Supp. 2d at 1347-48. The court clarified that in the absence of any other pricing documentation or evidence that subject import prices fell outside of Weirton's pre-determined range or that Weirton was somehow forced below its minimum price level, the court could not sustain the Commission's decision to discount the importance of Weirton's inability to substantiate the assertion that Weirton's prices were set at least in part in reaction to the presence of lower-priced Japanese imports. Id. Even if the Japanese producers did not submit purchaser documents on their contract negotiations with importers of subject merchandise, this fact is irrelevant to factors affecting how domestic producers set their pricing. The Commission's attempt to refute Nippon's argument speaks only to how foreign producers set their prices and says nothing about how *domestic producers* set their pricing, the fundamental issue in determining whether the presence of subject imports had an effect on domestic pricing in this case.

In sum, the Commission has not given the court any basis for sustaining its treatment of conditions of competition with regard to the effect of subject imports on domestic pricing.

### 3. Lost Sales and Revenue

The court in Nippon I found that the Commission's conclusions regarding the confirmed lost sales allegation[19] did not reflect the purchasing history data provided for the particular purchaser, and directed the Commission to "indicate the specific data upon which it relied" in

_____

[19] In the Final Determination, the Commission relied upon [        ] confirmation of [        ] lost sales allegation.

confirming the allegation, notwithstanding the Commission investigator's inability to find a competing import price for the sale while conducting the on-site verification. 182 F. Supp. 2d at 1349-50.

On remand, the Commission stated that it reexamined the one lost sales allegation that the Commission determined to be confirmed by the purchaser. The Commission specified that the allegation is consistent with a lost sale of [      ] tons of chromium coated steel to a particular purchaser's – [              ] – in fiscal year 2000 where Japanese producers had underbid all domestic producers, including the producer making the allegation – [      ]. Redetermination at 28.[20] The Commission found that the volume of the lost sale, combined with that of the three lost revenue allegations, represented a substantial percentage – [    ] percent – of the market, and was therefore significant. The Commission indicated, however, that it is difficult for suppliers to identify lost sales events because annual contracts are awarded to multiple suppliers, rather than spot sales with a single supplier.

Nippon argues that the lost sale allegation remains unsupported by substantial evidence on the ground that the producer making the allegation would have lost these sales even in the absence of Japanese competition.[21]

---

[20] The Commission explains for the first time that although the lost sale allegation involved a December 1998 quote for a 1999 delivery, the most relevant data provided by the purchaser is actually its [      ] purchases because [
                                    ]. Nippon does not contest the Commission's application of 1998 bid quotes to FY2000 purchase volumes. The Commission does not indicate whether this lag-time was applied for [      ] in its underselling analysis, thereby casting further doubt on its conclusions of significant underselling.

[21] Specifically, Nippon alleges that [
                                    ].

First, it appears that the Commission is confirming a lost sale allegation that may not have been made and wasn't verified, as the Staff Report indicates that Weirton claimed it lost a sale – also involving [      ] short tons – to a Japanese producer on a quote given in <u>October of 1998</u>, not December of 1998. <u>Compare</u> Staff Report at V-22 to 25 & Table V-14 <u>with</u> Redetermination at 28. Second, if the Commission is in fact referring to the lost sale allegation described in the Staff Report, the Commission's phraseology obscures the fact that the alleged lost sale involved a rejected U.S. price of $650, when 1998 bids by Weirton to the relevant facility in FY2000 never went below [      ], and in fact was [     ] for double rolled chromium coated steel sheet ("CCSS"). Furthermore, the Commission omits that the purchaser cited long-term commitments with its Japanese supplier,[22] and that Weirton did not bid seriously for its West Coast business, thereby supporting Nippon's contention that Weirton would have lost the sale to another domestic supplier in the absence of Japanese competition.[23] Lastly, the Commission's reliance on this single lost sale allegation is undermined by the purchaser's

---

[22] The Declaration of [            ], C.R. Docs. 222-223, Nippon Appendix at Tab 8, states that:

[



]

[23] In the Declaration, [      ] states that [



].

representation that any such sale was lost for several reasons: price, quality, delivery time, and whether the producer can supply globally. See Staff Report at V-25. Although in other circumstances a lost sale allegation might be confirmed and relied upon by the Commission even though other domestic producers underbid the producer making the allegation, the Commission's reliance on this particular lost sale allegation is unsupported because it ignores record evidence undermining the likelihood that a significant sale was lost for price reasons attributable to imports.

## II. Causation

The court in Nippon I instructed the Commission to determine whether quality and delivery time issues as well as non-subject imports "'may have such a predominant effect in producing the harm as to...prevent the [subject] imports from being a material factor.'" Nippon I, 182 F. Supp. 2d at 1350 (citing Taiwan Semiconductor Indus. Ass'n v. United States, 59 F. Supp. 2d 1324, 1329 (Ct. Int'l Trade 1999)). On remand, the Commission found that it was not persuaded by "inconsistent and contradictory" testimony that purchasers turned to Japanese sourcing solely because of domestic quality and delivery time problems or non-subject import competition.[24] The Commission concluded that, the significant volume of subject imports at declining prices, and the frequent underselling of the domestic like product, had adversely affected the domestic TCCSS industry.

## A. U.S. On-Time Performance and Quality

---

[24] The Commission had earlier discounted other causes and was not specifically ordered to reassess them, although it was ordered to reassess its overall decision to attribute material injury to subject imports.

In the Final Determination, the Commission had acknowledged that there was documentary evidence that showed domestic producers' on-time performance was poor during the POI.[25] It was not persuaded, however, by what it found to be inconsistent and contradictory purchaser testimony that these purchasers turned to Japanese sourcing because of non-price reasons. The Commission based this determination solely on the supposedly internally contradictory testimony of U.S. Can representatives.

In Nippon I, the court remanded on the issues of quality and on-time delivery, finding the Commission's reasons for rejecting purchaser testimony to be ill-founded and its conclusions incapable of being reviewed properly. 182 F. Supp. 2d at 1351-52. First, the court cited the Staff Report describing U.S. Can's purchasing history as showing two sets of pricing data for U.S. Steel, while Weirton was not listed at all. Second, the court found that Mr. Yurco had consistently stated U.S. Can shifted sourcing from Weirton to other domestic producers. Third, the court determined that the Commission failed to address U.S. Can's stated concerns with Weirton's on-time performance problems, or Weirton's performance requirements in its supply contract with U.S. Can. Fourth, the court indicated that the Commission failed to analyze whether quality problems were indeed prevalent among U.S. producers.

On remand, the Commission found that quality and delivery time problems do not preclude a finding that price factors adversely affected the domestic TCCSS industry. In support of its analysis, it considered the circumstances of four large purchasers, who have increased purchases of subject imports. In each case, the Commission found that low prices played an important role in the decisions of the purchasers to shift toward subject imports. The

---

[25] At times during the POI one major producer's on time performance did not reach 50%.

Commission considered testimonial evidence from the producers that delivery and quality issues were the predominant reasons for shifting volume to subject imports, and determined that the testimony did not preclude a finding that subject imports made a material contribution to the injury.

As a preliminary matter, the Commission failed to cite the sources of its individual purchaser volume data throughout its analysis. For its analysis of BWAY, it appeared to use numbers from Table TCCSS-1, while for the remaining purchasers it inexplicably appeared to use figures from tables in the Staff Report that for some reason conflict with Table TCCSS-1. In addition, the Commission supported its position with "trends" over limited periods of time, ignoring the full set of data, and omitting that a fluctuating year-by-year analysis at best would indicate that there had been no clear trend at all. Lastly, the Table TCCSS-1 shows bid and volume numbers for the years 1997 through 2000, yet the Commission never accounted for the year 2000, and at times limited its analysis to the change from 1998 to 1999. The Commission's apparent tunnel-vision is misleading and violates the court's directive to analyze and present data in a manner that facilitates review.

### 1. BWAY

The Commission found BWAY to be inconsistent in its testimony that its pattern of purchases reflected its attempt to broaden its portfolio of suppliers due to quality and delivery concerns, and its need to supply geographically diverse operations. BWAY specifically cited its concern with the on-time performance of Weirton, yet increased its purchases from Weirton from

1998 to 1999.[26]   The Commission concluded that increasing its supply from Weirton is inconsistent with BWAY's quality concerns, thus pointing to the predominance of price as a determining factor in purchaser decision-making.

Nippon responds that BWAY's testimony is not inconsistent, as it testified that, "[I]n 1998 and 1999 we had a series of delivery and quality disappointments with U.S. mills," not just Weirton.  Hr'g Tr., P.R. Doc. 74, Nippon App. Tab 4, at 198.[27]  Between 1998 and 1999, BWAY in fact reduced purchases from another producer – [        ] by [        ] tons, and a lower amount – [        ] tons – was shifted to Japanese suppliers in 1999, the only year in which BWAY purchased from Japanese subject importers.  In the same year, purchases from domestic suppliers also increased and purchases from non-subject importers were double that of the subject imports.  Thus, it is not inconsistent that BWAY increased purchases from Weirton notwithstanding quality and delivery problems, given that it was also experiencing similar problems with another domestic producer from which BWAY reduced its purchase volume.

**2. Crown**

The Commission noted on remand that Crown's questionnaire response attributed its increased purchases of subject imports in 1999 to quality- and performance-driven West Coast shortage of supply from two domestic suppliers.[28]  Redetermination at 35.  The Commission

---

[26]  Specifically, the Commission indicated that BWAY [

].

[27] BWAY's questionnaire response [

].

[28]  The Commission specified that Crown attributed the shift to Japanese sources to [

found Crown's stated quality concerns to be inconsistent because Crown's data showed that it

had directed significant volume requirements to markedly *lower-priced* TCCSS from Japan,

beginning in 1999, and that it in fact qualified a particular domestic producer – [        ] – and

sourced TCCSS from [       ] U.S. mills in 1999.  The Commission indicated that it would expect

to see *higher* prices paid to Japanese producers where superior quality was the supposed

predominant factor behind Crown's purchase decisions.

Nippon responds that the Commission's focus on the lower prices of subject imports

sidesteps Crown's explanation of its problems with the two West Coast suppliers, and that the

data supports such explanation.[29]   Either a showing of adequate West Coast supply of quality

TCCSS, or a showing of East Coast suppliers willing to fill the void would provide sufficient

evidence of inconsistency in Crown's testimony.  The court finds that the Commission has failed

to provide any specific evidence that would contradict Crown's explanation for its shift to

Japanese sources.  The fact that Japanese prices were generally lower than domestic prices does

not negate the verifiable claims of quality and performance concerns with West Coast suppliers.

Furthermore, Crown's qualification of a particular producer – [        ] – is not necessarily

inconsistent with its stated quality concerns, since a supplier's drop in performance may not be of

such an extent as to entirely preclude it from being a qualified source of supply.  In addition,

Crown's significant increase of its purchases of TCCSS from the particular producer in both

1999 and 2000 is not necessarily inconsistent with its quality concerns, as Crown in fact

                                        ]

[29] Nippon indicates that Crown's data show a decrease in purchases from [        ] of [
   ] tons corresponds to a [        ] ton increase in purchases from subject importers.

significantly reduced its purchases from two other domestic suppliers – [        ] and [        ] – with quality concerns that may have been more extensive. Under the unique facts of this case there is no support for the Commission's assumption that if domestic producers switch from lower quality producers, they would not be expected to pay lower prices. The Commission does not provide substantial evidence to discount the purchaser testimony that quality and on-time considerations in a certain geographic area were the dominant factors in its purchasing decisions.

### 3. Silgan

The Commission found that Silgan described its purchases of subject imports as being primarily for specialized applications that are either not available from a U.S. producer or of a quality level not obtainable from a U.S. producer. Redetermination at 36. Silgan attributed its increase in purchases of TCCSS from Japan as a result of its acquisition of Campbell's Soup, which used small quantities of TCCSS produced by Nippon because of its superior quality and according to certain unique specifications not available from U.S. domestic producers. Id. The Commission also cited Silgan's testimony that it terminated Weirton as a supplier for failing to meet Silgan's quality and service requirements. Finally, Silgan stated that if it were to purchase according to price, it would purchase from Brazil, Korea and Taiwan.

The Commission found Silgan's testimony inconsistent because most of Silgan's specialized purchases could in fact be made from U.S. producers. It acknowledged that most of the increase in Silgan's purchases was attributable to its acquisition of Campbell's, but it asserts that [                                ]. The Commission also acknowledges that Silgan [

        ] and [                                ], but discounted this evidence because Silgan [        ] its purchases of Japanese subject imports. Finally, the Commission states that deciding not to

purchase from Brazil, Korea, and Taiwan reflects its priority rankings where [

].

Nippon argues that the Commission ignores the extent of the quality concerns

documented by Silgan in its dealings with [        ] and other U.S. mills.  The court agrees that

Silgan's testimony is entirely consistent with the evidence relating to its quality problems.  On

remand, the Commission has made no further effort to determine whether the extensive quality

concerns with domestic producers were not the reason Silgan increased subject imports.

Furthermore, the Commission acknowledges that the acquisition of Campbell's was the

predominant factor in the increase in subject import prices paid by Silgan, but does not explain

why it finds inconsistent Silgan's explanations for not shifting its purchases to domestic TCCSS

producers when Silgan testified they are perceived to be of inferior quality.  The Commission is

correct to perceive that Silgan's priorities appear to be [                    ], in that order, but fails to

recognize that the same ranking of priorities explains why Silgan chose not to purchase from

Brazil, Korea, and Taiwan, and explains why Silgan would shift its purchases toward subject

imports.  The Commission fails to cite substantial evidence indicating that Silgan's predominant

purchasing decision was not based on its stated quality and on-time performance concerns.

### 4. U.S. Can

U.S. Can had testified that delivery time and quality reasons were the two reasons U.S.

Can reduced its volume from a particular producer –  [        ]. On remand, the Commission

conceded that it erred in finding Mr. Yurco's testimony to be inconsistent in its prior

determination. The Commission maintained, however, that U.S. Can's stated concerns about on-

time delivery and quality, and its desire to source globally were not supported by the record.  The

Commission based its conclusion on a domestic producer's – [          ] – records showing that on-time performance rates did not drop below contractual levels for sourcing from another supplier until late in the POI, that is [          ].   Further, the Commission found that U.S. Can documents discuss quality issues only after volume was reduced from the particular domestic producer.[30]

First, simply because performance rates prior to 1999 were not yet so poor that they were grounds for sourcing from another supplier does not mean that performance was not a concern. Second, U.S. Can's internal documents indicate that quality problems persisted with the domestic producer "for a long period of time," a fact that is not negated by statements in the same document that the problems had improved over this time.  Thus, contrary to the Commission's conclusion, the evidence indicates that the producer had a track record of quality problems in supplying U.S. Can and consistently failed to meet delivery time, such that the Commission's rejection of U.S. Can's testimony regarding volume reductions is not well-founded.

**B. Non-Subject Imports**

On remand, the Commission was required to examine whether non-subject import volume and pricing did not constitute the predominant source of injury sufficient to sever the link to causation by subject imports in light of the conditions of competition, particularly regional distribution of shipments.

**1. Volume**

The court in Nippon I instructed the Commission to address Nippon's concern that non-

---

[30] The Commission also states that there was a [
                                         ].

subject imports were predominant in the regions where the majority of domestic shipments were concentrated.    182 F. Supp. 2d at 1354-55.  On remand, the Commission indicated that the record showed that: (1) the financial performance of U.S. mills primarily competing on the West Coast "mirrored" the poor performance of domestic mills competing on the East Coast; (2) the rapid increase in subject imports entered both regions at comparable levels; and (3) subject import pricing was aggressive across the country.

Specifically, the Commission presented evidence of poor performance by a particular producer – [        ] – which sells [    ] percent of its shipments on the West Coast.  Specifically, from 1997 to 1999, this producer experienced a significant drop in operating income, net sales in terms of value and volume, and gross profits.  Simply noting the declining performance of West Coast TCCSS producers is not sufficient to establish that subject imports were not precluded from being the source of that harm. To find subject imports a material cause, even on the West Coast where non-subject imports were not the predominant imports, the Commission needed to determine whether there is a *correlation* between the supposedly declining U.S. mills' West Coast revenues, specific instances of underbidding by producers of subject imports, and a subsequent shift in volume to those subject imports.  The Commission's assertion that subject import volume increased in comparable amounts on the West Coast and East Coast, without specific supporting evidence, such as an increase in volume that correlates in some way to instances of subject import underbidding, does not meet this requirement, nor does the Commission's assertion that subject importers bid aggressively industry wide.

## 2. Non-subject Import Pricing

On remand, the Commission was first required to reassess non-subject underselling by

either providing further explanation for how it divided non-subject importers into "countries that are sources of high-quality TCCSS" and "those whose principal sales advantages are favorable prices and/or discounts," or grouping non-subject importers in one set for comparison to bids made by subject importers. Nippon I, 182 F. Supp. 2d at 1355-56. The Commission responded by providing Table TCCSS-4 comparing final bids submitted by suppliers of subject imports versus final bids by suppliers of non-subject imports. The Commission found a marked reversal in terms of pricing in the marketplace. Whereas in 1997-98 final bids submitted by subject import suppliers were higher than final bids from non-subject import suppliers, in 1999-00 the subject importers overbid less than one half of the time.

It is unclear why the Commission chose to analyze this chart in two year increments when there is only one recorded instance in 2000 where subject and non-subject importers made final bids for the same purchaser. The Commission omits that a year-to-year trend analysis indicates that there is no clear pattern to the bidding relationship of subject and non-subject importers, and certainly not a marked reversal in terms of pricing in the marketplace. In 1997, non-subject importers underbid subject importers twice and overbid twice. In 1998, non-subject underbidding increased to six instances, while overbidding decreased to three instances. Finally in 1999, non-subject underbidding retreated to four instances, while overbidding increased to three.

The Commission was also required to construct a table comparing Japanese prices directly to non-subject prices. The Commission submitted Table TCCSS 5 and 6 comparing actual weighted average prices and discount rates for subject imports and non-subject imports. Once again it found a marked reversal in terms of pricing in the marketplace, finding a trend

from higher Japanese prices (and lower discount rates) to lower Japanese prices (and higher

discount rates). Once again the Commission's analysis of the data is misleading. By collapsing

data for the years 1997-98, the Commission masks the similarity between the years 1997 and

1999. In 1997 there were two instances of non-subject underbidding of Japanese imports and

one instance of Japanese underbidding. In 1999, there were two instances of non-subject

underbidding, one instance of Japanese underbidding, and one instance where bids were the

same. In 1998, the numbers are the same as 1999, except there is one additional instance of non-

subject underbidding. Contrary to the Commission's assertion, there is no evidence to support a

finding of a marked reversal in terms of pricing in the marketplace.

The Commission has inadequately responded to the court's concerns regarding whether

non-subject imports were the predominant cause of harm to the domestic TCCSS industry, so as

to undermine the finding of harm by subject imports.[31]

---

[31] The court acknowledges that there may be more than one sufficient cause of material injury. The question is whether the evidentiary links for causation of material injury by subject imports are severed.

**CONCLUSION**

The record reflects that the increased subject import volume must be attributed largely to purchaser priorities that are unrelated to price. Purchasers began sourcing more merchandise from subject importers because of poor performance and quality issues with domestic producers. Further, few domestic producers ship to the West, where the majority of imports from Japan are sold. The record also reflects that the market conditions were such that the effect of subject imports on domestic prices did not cause material harm. Purchasers reported that they conduct their price negotiations with domestic suppliers first, and then conduct negotiations with importers to meet additional needs. Annual contracts, setting a fixed price and volume targets, require domestic producers to meet only other domestic prices, and there is no evidence that purchasers shifted volume after signing the contracts to lower priced subject imports. Lower Japanese prices reflect that the domestic industry is able to charge a price premium for its lead-time delivery advantage over subject importers. Lastly, throughout the POI non-subject importers held a larger market share than subject importers from Japan, and an even larger market share on the East Coast, where domestic suppliers are concentrated.

As the Commission's concessions and uncontested evidence lead inexorably to the conclusion that lower priced subject imports did not have a material effect on domestic prices, and in the absence of any valid reason to discount non-price factors or non-subject imports as the predominant cause of material injury, the court remands with instructions for the Commission to revoke the antidumping duty order. Remand for reconsideration or recalculation is not necessary in this case, as not only are the Commission's conclusions unsupported by substantial evidence, it has also demonstrated an unwillingness or inability to address the substantial claims made by

respondents or the concerns expressed by the court in <u>Nippon I</u>, leaving the only reasonable

conclusion from the evidence on the record to be that subject imports were not a material cause

of injury to the domestic TCCSS industry.[32]  The Commission's determination is vacated and the

Commission is directed to enter a negative determination.


_____

Jane A. Restani
Judge


DATED:  New York, New York

This 9th day of August, 2002

---

[32] Because neither Defendant nor Defendant-Intervenor has suggested threat of material injury as an alternative basis for an affirmative injury finding the court declines to remand for consideration of threat.